[No. 74073-9.   En Banc.]
Argued February 24, 2004.    Decided September 22, 2005.

HABITAT WATCH, *Appellant*, v. SKAGIT COUNTY, *Respondent*.

*Jeffrey M. Eustis*, for appellant.

*Thomas E. Seguine*, *Prosecuting Attorney*, and *Paul H. Reilly*, *Deputy*; *John W. Hicks*; and *Le Anne M. Bremer* (of *Miller Nash, L.L.P.*), for respondent.

*John M. Groen* and *Timothy M. Harris* on behalf of Building Industry Association of Washington, amicus curiae.

¶1 FAIRHURST, J. — In 1993, Skagit County granted a special use permit, valid for two years, for the construction of a golf course. The project languished in the hands of its first two owners, and by the time the Upper Skagit Indian Tribe bought the project and finally began construction in 2002, the special use permit had been extended three times.

¶2 Habitat Watch, a citizens group comprised of property owners neighboring the proposed golf course site, opposed the project. Habitat Watch was a party in public hearings that were held prior to the issuance of the initial permit and prior to the first permit extension. Although notice and a hearing were provided for the initial permit decision and the first extension, the county mistakenly failed to provide notice or a public hearing for the second and third permit extensions. As a result, Habitat Watch did not learn of the continued existence of the golf course project until construction began in 2002, seven years after the last public hearing on the project.

¶3 Habitat Watch argues that because notice and an opportunity to be heard were not provided with respect to the last two permit extensions, those extensions are void and susceptible to challenge at any time. The county and the tribe concede that the second and third permit extensions were granted without notice or public hearings. They argue, nevertheless, that the extensions are valid under the

Land Use Petition Act (LUPA), chapter 36.70C RCW, because Habitat Watch failed to appeal the extensions, despite lack of notice, within 21 days of issuance, and because Habitat Watch failed to exhaust available administrative remedies. We hold that Habitat Watch's challenges are barred by LUPA and affirm the judgments of the trial court.

## I. STATEMENT OF THE CASE

¶4 In 1993, the Skagit County hearing examiner granted a special use permit to David Moore for the construction of a golf course. Notice and a public hearing on Moore's application were properly provided pursuant to former Skagit County Code (SCC) 14.04.150(4) (1993). In the hearing, Habitat Watch raised the concerns of surrounding landowners, including that the golf course would negatively impact water quality and substantially impact local water supplies.

¶5 Despite Habitat Watch's objections, the special use permit was granted for a two year period to expire June 14, 1995, after which the grant of approval for the golf course would automatically expire. Ex. 104.h (findings of fact, entry of order) ("The project must be started within two (2) years of the date of this order or the Special Use Permit will become void."); *see, e.g.,* SCC 14.16.900(2)(d), (d)(ii) ("All special uses . . . shall require a development project be commenced for the entire parcel within 2 years of the permit approval." Failure to meet the deadline results in "automatic permit reversion.").

¶6 The project did not meet the deadline established by the special use permit. Still interested in the project, Moore requested that the hearing examiner "extend" the permit for two additional years. Pursuant to the Skagit County Code, the same procedures required for the initial grant of a special use permit were required to grant an extension of a permit. Former SCC 14.04.150(3)(f), (4); former SCC 14.04.240(9) (1993). Extensions, like initial permit grants, required the hearing examiner to provide notice and "con-

duct public hearings, prepare a record thereof and enter findings of fact and conclusions based upon those facts." Former SCC 14.04.240(9)(a). In the words of the county permit office, "[t]he proper procedures were outlined in former SCC 14.04.150(3)(f)[1] and required the Hearing Examiner to conduct a public hearing before amending [e.g., to extend] a Special Use Permit." Ex. 203.

¶7 Accordingly, notice was provided and a public hearing was held to consider Moore's extension request. *See* Ex. 104.i. Habitat Watch participated in the proceedings and presented the hearing examiner with evidence in opposition to the project. After weighing the evidence presented, the hearing examiner decided to extend the permit two additional years and provided, "[t]he project must be started by June 14, 1997 or the Special Use Permit will become void." Clerk's Papers (CP) at 1083. Habitat Watch did not request reconsideration of or appeal this decision as provided for in former SCC 14.04.240(15)-(16).

¶8 Moore subsequently sold the land and golf course project to the Port Gardner Timber Company. Port Gardner failed to meet the project commencement deadline for the extended special use permit and requested that another extension permit be issued. Unlike the initial grant of the permit and first extension, the hearing examiner failed to provide notice of Port Gardner's extension request and failed to conduct a public hearing. *Compare* Ex. 104.j (making no mention of notice given in the second extension), *with* Ex. 104.i (first extension stating "notice having been given to all property owners within 300 feet of said property"). Nevertheless, the hearing examiner granted the request for a new two year special use permit extension, pushing the deadline for commencement of the golf course project to June 14, 1999. No notice of the decision was provided to parties other than Port Gardner.

---

[1] Former SCC 14.04.150(3)(f) states, among other things, that public hearings for extensions are to be granted "in the same manner as provided in Section 14.04.150(4)," the section governing initial permit requests.

¶9 Anticipating its failure to meet the June 1999 deadline, Port Gardner made an oral request for an additional extension in November 1998. In response to this oral request, the hearing examiner again granted an extension without holding a public hearing or providing notice of the request or of the decision.[2] The deadline for commencement was pushed back until June 14, 2002. *Id.*

¶10 In 2000, the Upper Skagit Indian Tribe purchased the property from Port Gardner and actively pursued the golf course project. The tribe requested and received a letter from Skagit County confirming that the special use permit was valid and would expire on June 14, 2002.

¶11 In May 2002, a Habitat Watch member noticed logging activity near the proposed golf course site. This activity came nearly five years after the last properly granted permit expired and seven years after the last public hearing on the project. By June 5, 2002, Habitat Watch became aware that a golf course project was still proceeding at the site despite the long delay since the last public hearing.

¶12 On June 7, 2002, Habitat Watch submitted a public disclosure request to Skagit County to determine the authority for the golf course project and learned that the project was going forward based on extensions of the 1993 permit originally granted to Moore. The county did not make applicable records available to Habitat Watch until June 24, 2002. Habitat Watch previously believed that Moore's permit, which was subsequently sold to Port Gardner and then the tribe, had expired in 1997 after the

---

[2] In addition to failing to provide notice and a public hearing prior to rendering a decision, the hearing examiner's decision contained either a typographical or mathematical error. The final permit extension stated that the commencement deadline was extended "for two (2) additional years until June 14, 2002." CP at 1094. Since the preceding extension purportedly expired on June 14, 1999, an additional two year extension would expire in 2001, not 2002. However, condition number 15 was specifically modified to require "[t]he project must be started by June 14, 2002 or the Special Use Permit will become void." Ex. 104.k. Although Habitat Watch argues that the permit extension should be interpreted to only last until 2001, the relevant language requires the extension to last until June 14, 2002.

first properly granted permit extension had lapsed. The records made available to Habitat Watch through its public disclosure request showed that the permit had been extended two more times, until June 14, 2002. On July 11, 2002, Habitat Watch filed with the county a petition to revoke the special use permit because the project had not timely commenced.

¶13 After the petition for revocation was filed, the county issued a grading permit for the project on July 26, 2002. The grading permit was contingent on the underlying validity of the special use permit extensions challenged in Habitat Watch's petition for revocation. In response to the county's issuance of the grading permit, on July 31, 2002, Habitat Watch filed a LUPA petition and a complaint for declaratory and injunctive relief in superior court to challenge both the grading permit and the validity of the last two special use permit extensions.

¶14 On November 7, 2002, the superior court dismissed Habitat Watch's challenge to the 1997 and 1998 special use permit extensions because the appeal was not filed within 21 days of the issuance of the extensions and for failure to exhaust administrative remedies. As a result, the court declined to address the merits of the appeal because it did not have jurisdiction under LUPA to do so.[3] The court stayed the portion of the LUPA challenge related to the grading permits to allow the proceeding on the petition for revocation of the special use permit to conclude.

¶15 The hearing examiner denied Habitat Watch's petition for revocation on September 30, 2002, and denied reconsideration of that decision on October 8, 2002. The board of county commissioners denied Habitat Watch's appeal of that decision in a resolution dated December 9, 2002. On December 20, 2002, Habitat Watch filed a supplemental LUPA action appealing the denial of its petition for revocation of the special use permit.

---

[3] Habitat Watch also claimed that the superior court had jurisdiction to hear its appeal under article IV, section 6 of our state constitution. Habitat Watch has not pursued this argument on appeal to this court. Therefore, we do not address it.

¶16 In a summary judgment hearing, the superior court considered together the remaining challenge to the grading permit from the original LUPA action and the new challenge to the denial of the petition for revocation of the special use permit from the supplemental LUPA action. On May 13, 2003, the trial court granted summary judgment against Habitat Watch, ordered that the grading permit was valid, and affirmed the decision denying Habitat Watch's petition for revocation.[4] In contrast to its earlier dismissal on November 7, 2002, the trial court did not find that the challenges to the grading permit or the denial of the petition for revocation were time barred under LUPA. Rather, the trial court reviewed these decisions pursuant to LUPA and found against Habitat Watch as a matter of law.

¶17 We granted Habitat Watch's petition for direct review.

## II. QUESTIONS PRESENTED

A. Were Habitat Watch's challenges to the 1997 and 1998 extensions to the special use permit time barred under LUPA?

B. Was the grading permit lawfully approved?

C. Was the petition for revocation properly denied?

D. Does RCW 4.84.370, the statute awarding attorney fees and costs to the prevailing party at all levels, violate equal protection?

## III. ANALYSIS

■■ ¶18 "In reviewing an administrative decision, an appellate court stands in the same position as the superior

---

[4] The trial court also ordered that "[t]he 1997 and 1998 extensions of the special use permit were validly granted," but the validity of the special use permit extensions was no longer on the table due to the earlier dismissal order signed on November 7, 2002. CP at 39, 818. This conclusion, along with two additional determinations—that the project was commenced within the required time limit and that the Skagit County Commissioners used the proper procedure in denying Habitat Watch's petition for revocation—all supported the trial court's ultimate decision to affirm the denial of the petition for revocation.

court." *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). Conclusions of law are reviewed de novo. *Id.*

A. Challenges to the validity of the 1997 and 1998 extensions

¶19 The trial court dismissed Habitat Watch's challenges to the validity of the 1997 and 1998 special use permit extensions because the land use petition was not filed within 21 days of the issuance of those extensions and because Habitat Watch did not have standing because of its failure to exhaust administrative remedies.

¶20 Habitat Watch argues that the last two permit extensions are void because the hearing examiner did not provide notice or a public hearing and that LUPA cannot ever bar judicial review of such decisions. The county argues that LUPA does not distinguish between decisions issued with proper notice and decisions issued without proper notice and asserts that, regardless, the 21-day limitation period runs from the date of decision. The tribe focuses its argument for affirming the trial court's dismissal on the exhaustion of remedies ground. With respect to the debate over whether Habitat Watch's challenges are time barred under LUPA, the tribe urges the court to adopt an analysis under which, in the absence of proper statutorily or constitutionally required notice, the 21-day period begins to run upon actual or constructive notice of the land use decision.

■ ■ ¶21 LUPA's stated purpose is "timely judicial review." RCW 36.70C.010. It establishes a uniform 21-day deadline for appealing the final decisions of local land use authorities and is intended to prevent parties from delaying judicial review at the conclusion of the local administrative process. As we have recently interpreted LUPA in *Wenatchee Sportsmen, Chelan County v. Nykreim*, 146 Wn.2d 904, 52 P.3d 1 (2002), and *Samuel's Furniture, Inc. v. Department of Ecology*, 147 Wn.2d 440, 54 P.3d 1194, 63 P.3d 764 (2002), once a party has had a chance to challenge

a land use decision and exhaust all appropriate administrative remedies, a land use decision becomes unreviewable by the courts if not appealed to superior court within LUPA's specified timeline. *See, e.g., Wenatchee Sportsmen,* 141 Wn.2d at 181 ("Because [LUPA] prevents a court from reviewing a petition that is untimely, approval of the rezone became valid once the opportunity to challenge it passed."); *Nykreim,* 146 Wn.2d at 925, 940.

¶22 LUPA embodies the same idea expressed by this court in pre-LUPA decisions—that even illegal decisions must be challenged in a timely, appropriate manner. *See Pierce v. King County,* 62 Wn.2d 324, 334, 382 P.2d 628 (1963) (holding that even though a county resolution constituted illegal spot zoning and was therefore void ab initio, the applicable limitations period "begins with acquisition of knowledge or with the occurrence of events from which notice ought to be inferred as a matter of law."). Under LUPA, relief may be granted where "[t]he body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process" and where "[t]he land use decision is outside the authority or jurisdiction of the body or officer making the decision." RCW 36.70C.130(1)(a), (e). Thus, defects in land use determinations that could have resulted in decisions that were void ab initio under pre-LUPA cases fall within LUPA, with its express 21-day limitation period. Moreover, the act quite clearly declares legislative intent that chapter 36.70C RCW is to be "the exclusive means of judicial review of land use decisions." RCW 36.70C.030(1).

¶23 LUPA specifically applies to the particular type of decision at issue here. This court held that a challenge to a special use permit decision made before enactment of LUPA was appropriately brought by way of a petition for writ of certiorari under chapter 7.16 RCW. *Dev. Servs. of Am., Inc. v. City of Seattle,* 138 Wn.2d 107, 115, 979 P.2d 387 (1999); *Sunderland Family Treatment Servs. v. City of Pasco,* 127 Wn.2d 782, 788, 903 P.2d 986 (1995). When enacting LUPA, the legislature expressly provided that the

act "replaces the writ of certiorari for appeal of land use decisions." RCW 36.70C.030(1). There should be no question that a challenge to a special use permit decision lies within LUPA—even where the decision is allegedly void.

¶24 LUPA's statute of limitations begins to run on the date a land use decision is issued. RCW 36.70C.040(2)-(4). The statute designates the exact date a land use decision is "issued," based on whether the decision is written, made by ordinance or resolution, or in some other fashion. RCW 36-.70C.040(4)(a). When a land use decision is written, it is issued either three days after it is mailed or on the date that the local jurisdiction provides notice that the decision is publicly available. *Id.* The statute does not indicate to whom the decision should be mailed (or other notice provided), and appears to presume that this specification is indicated elsewhere. When a decision is made by ordinance or resolution, the decision is issued on the date the legislative body passes such ordinance or resolution. RCW 36-.70C.040(4)(b). Finally, the statute provides that if neither of the above categories apply, a land use decision is issued on the date it is entered into the public record. RCW 36-.70C.040(4)(c).

¶25 Here, it is not clear from the record or the briefing when the final two permit extensions were issued within the meaning of RCW 36.70C.040(4). There is nothing in the record that shows the extension decisions were mailed to all parties of record, or otherwise made publicly known, or passed by ordinance or resolution. It is also unclear if and when the decisions were "entered" into the public record.[5]

---

[5] Further, it may not have been possible for the decisions in this case to have been issued via entrance into the public record, depending upon the legislature's intent in designating the three types of issuance in RCW 36.70C.040(4). There are two possible interpretations of the language in RCW 36.70C.040(4)(c) ("*If neither (a) nor (b) of this subsection applies*, the date the decision is entered into the public record." (emphasis added)). First, subsection (c) could mean that if a decision is not mailed, if notice is not given that a decision is publicly available, and if a decision is not made by ordinance or resolution, then any land use decision is issued once it is entered into the public record. Under this interpretation, subsection (c) is a catch-all provision that applies whenever the requirements for issuance under subsections (a) and (b) are not fulfilled.

¶26 At the very latest, the written decisions were issued when the county made them available on June 24, 2002, in response to Habitat Watch's public disclosure request. By the date of the county's response to Habitat Watch's public disclosure request, the county had provided "notice that a written decision is publicly available" pursuant to RCW 36.70C.040(4)(a).[6] After seeing the permit extensions, but before commencing a LUPA action, Habitat Watch filed a petition for revocation with the county pursuant to former SCC 14.04.150(3)(f). Habitat Watch did not file a LUPA petition directly challenging the permit extensions until August 1, 2002—well over 21 days after the permit extensions were made available to Habitat Watch on June 24, 2002.[7] As such, the petition was time barred under RCW 36.70C.040(2) and the superior court was correct to

---

The second, and more likely, interpretation is that if a decision is neither written (as provided for in subsection (a)) nor made by ordinance or resolution (subsection (b)), then it is issued on the date it is entered into the public record. Subsection (c), then, does not include decisions covered under subsections (a) and (b), but would include other types, such as decisions made orally at a city council meeting. These decisions would be issued when the minutes from the meeting are made open to the public or the decision is otherwise memorialized such that it is publicly accessible. Under this scenario, subsection (c) would not apply to this case because the decisions at issue were written and thus could be issued only under subsection (a), when they were either mailed or notice was given that the decisions were publicly available.

[6] We need not determine when the decisions were issued because even under the last possible date, Habitat Watch failed to file a LUPA petition within 21 days.

[7] Upon viewing the permit extensions, it should have been clear to Habitat Watch that the extensions were final decisions subject to LUPA's procedural requirements—they were decided roughly five years prior and any opportunity to appeal those modifications within the county code had long expired. Had Habitat Watch filed a LUPA petition before or in consort with filing the petition for revocation with the county, things might have been different. Instead, Habitat Watch chose to first file a petition for revocation in which it necessarily collaterally challenged the validity of the final two permit extensions. But this does not excuse Habitat Watch from the need to appeal the extensions directly within 21 days of issuance. Under former SCC 14.04.150(3)(f), the only basis upon which a permit could be revoked would be failure to satisfy a condition. Thus, any challenge to the validity of the extensions within a petition for revocation is collateral rather than direct. Because the opportunity for direct administrative appeal of the extensions had passed with Habitat Watch having no notice of the decisions, its next step would be an appeal to the superior court via LUPA. *See Wenatchee Sportsmen*, 141 Wn.2d at 181.

dismiss Habitat Watch's challenges to the permit extensions.[8]

B. The grading permit

¶27 Habitat Watch also sought to vacate the grading permit in its LUPA petition. In granting summary judgment to the tribe and the county on the grading permit issue, the trial court found that the grading permit was "granted in accordance with the State Environmental Policy Act [ch. 43.21C RCW] and is therefore valid." CP at 39.

■ ¶28 Habitat Watch appeals the dismissal of its challenge to the grading permit on the sole ground that it was issued for an impermissible use. Habitat Watch argues that because there was no lawful establishment of golf course use, the approval of the grading permit for golf course construction was precluded. Our decision in *Wenatchee Sportsmen* precludes consideration of this challenge.

¶29 In *Wenatchee Sportsmen*, this court held that a petitioner could not collaterally challenge a rezone decision by way of its LUPA petition that challenged a plat approval when the period for challenging the initial rezone decision had already passed. 141 Wn.2d at 181. The rule applied in *Wenatchee Sportsmen* controls the present issue. In challenging the grading permit, Habitat Watch actually (and exclusively) challenges the validity of the special use permit and its extensions. Because appeal of the special use permit and its extensions are time barred under LUPA, Habitat

---

[8] The superior court also found that Habitat Watch did not exhaust its administrative remedies prior to bringing its LUPA action and, therefore, it did not have standing. *See* RCW 36.70C.060(2)(d). Because we affirm the superior court's dismissal on the limitation period ground, we need not address the exhaustion of remedies argument.

Habitat Watch asserts that the LUPA statute of limitation should not apply to bar its claim because it was deprived of due process when the county failed to provide notice of its land use decision. We do not address this claim because on the same last possible date we found that the land use decisions were issued, Habitat Watch also had actual notice of the decisions. Thus, even if Habitat Watch was entitled to notice under constitutional due process, *see Barrie v. Kitsap County*, 84 Wn.2d 579, 585, 527 P.2d 1377 (1974), it would be barred under the statute of limitations for failing to appeal within 21 days of such notice.

Watch cannot collaterally attack them through its challenge to the grading permit. The trial court correctly found the grading permit was valid.

## C. The petition for revocation

¶30 After learning of the last two extensions to the special use permit, Habitat Watch administratively sought revocation of the special use permit pursuant to SCC 14.16.900(2)(b)(iii). Habitat Watch argued that the permit should be revoked because the project was not commenced by the applicable deadline. First, Habitat Watch asserted that the deadline for commencement was never lawfully extended to June 14, 2002, and that rather, assuming the third permit extension was valid, the third permit extension should be interpreted to set a deadline of June 14, 2001.[9] Second, Habitat Watch claimed that, regardless of the date when the project had to begin, the project did not in fact commence by the later date of June 14, 2002. The hearing examiner denied the petition to revoke. After Habitat Watch was unsuccessful in its appeal before the board, it supplemented its LUPA petition with appeals of the hearing examiner and board denials.

¶31 The superior court affirmed the administrative decisions to deny Habitat Watch's petition for revocation, concluding that "[t]he 1997 and 1998 extensions of the special use permit were validly granted," the project was commenced within the established time limit and was, therefore, valid, and the procedures used to deny Habitat Watch's petition for revocation were in compliance with county code and state law. CP at 39.

¶32 Despite the inconsistency found in the hearing examiner's written decision granting the third permit extension (between the text "two (2) additional years," which would establish a deadline of June 14, 2001, and "until

---

[9] Habitat Watch also argued in its petition for revocation that the final two permit extensions were invalid so the last legally established deadline was June 14, 1997. For reasons explained throughout this opinion, and more specifically in note 4, *supra*, we do not address these collateral arguments.

June 14, 2002"), the outcome was that condition number 15 of the special use permit was modified to read "[t]he project must be started by June 14, 2002 or the Special Use permit will become void." Ex. 104.k. To the extent that Habitat Watch challenges the proper deadline established in the modification of the special use permit, it is actually challenging the third permit extension. As previously noted several times, any challenge to the third permit extension is barred by LUPA.

¶33 Assuming the deadline for commencement was June 14, 2002, Habitat Watch argues that the planning and preparation that had taken place to date—including the harvesting of trees and the filing of an application for a grade and fill permit—was insufficient to start the project. However, it fails to adequately support this claim. While Habitat Watch argues the hearing examiner anticipated more than mere planning and design work would be required to start the project, this does not mean that tree harvesting or applying for a grading permit are insufficient. In denying Habitat Watch's petition for revocation, the hearing examiner found that the tribe had submitted an extensive application for a grading permit, retained a surveyor to work on the property, obtained a forest practice conversion permit, put into place an excavator, chain saws, and logging equipment, and removed trees from the property, all prior to June 14, 2002. CP at 806. Habitat Watch has not challenged these findings of fact. The hearing examiner determined that the project commenced when the tribe applied for the grading permit. Local jurisdictions with expertise in land use decisions are afforded an appropriate level of deference in interpretations of law under LUPA. RCW 36.70C.130. Habitat Watch provides us with no reason to depart from the hearing examiner's determination that the project had started by June 14, 2002, and we decline to do so.

D. Attorney fees

¶34 As the prevailing parties at all levels of administrative and judicial review, the tribe and the county assert

they are entitled to attorney fees pursuant to RCW 4.84-.370, which provides in full:

(1) Notwithstanding any other provisions of this chapter, reasonable attorneys' fees and costs shall be awarded to the prevailing party or substantially prevailing party on appeal before the court of appeals or the supreme court of a decision by a county, city, or town to issue, condition, or deny a development permit involving a site-specific rezone, zoning, plat, conditional use, variance, shoreline permit, building permit, site plan, or similar land use approval or decision. The court shall award and determine the amount of reasonable attorneys' fees and costs under this section if:

(a) The prevailing party on appeal was the prevailing or substantially prevailing party before the county, city, or town, or in a decision involving a substantial development permit under chapter 90.58 RCW, the prevailing party on appeal was the prevailing party or the substantially prevailing party before the shoreline[s] hearing board; and

(b) The prevailing party on appeal was the prevailing party or substantially prevailing party in all prior judicial proceedings.

(2) In addition to the prevailing party under subsection (1) of this section, the county, city, or town whose decision is on appeal is considered a prevailing party if its decision is upheld at superior court and on appeal.

Under this statute, parties are entitled to attorney fees only if a county, city, or town's decision is rendered in their favor and at least two courts affirm that decision. The possibility of attorney fees does not arise until a land use decision has been appealed at least twice: before the superior court and before the Court of Appeals and/or the Supreme Court. RCW 4.84.370(1). Thus, parties challenging a land use decision get one opportunity to do so free of the risk of having to pay other parties' attorney fees and costs if they are unsuccessful before the superior court. *See Baker v. Tri-Mountain Res., Inc.*, 94 Wn. App. 849, 854, 973 P.2d 1078 (1999). Unless we accept Habitat Watch's argument

that RCW 4.84.370 is unconstitutional, the county and the tribe are entitled to attorney fees.

¶35 Habitat Watch asks this court to find that RCW 4.84.370 is unconstitutional because it "denies equal protection by discriminating among parties in the exercise of fundamental, First Amendment petitioning rights based not on the merits of their claims but upon whether their positions are aligned with the government." Reply Br. of Habitat Watch at 33. "A statute is presumed to be constitutional, and the party challenging its constitutionality bears the burden of proving its unconstitutionality beyond a reasonable doubt." *State v. Thorne*, 129 Wn.2d 736, 769-70, 921 P.2d 514 (1996).

> The right to equal protection guarantees that persons similarly situated with respect to a legitimate purpose of the law receive like treatment. In order to determine whether the equal protection clause has been violated, one of three tests is employed. First, strict scrutiny is applied when a classification affects a fundamental right or a suspect class. Second, intermediate scrutiny is applied when a classification affects both a liberty right and a semi-suspect class not accountable for its status. The third test is rational basis. Under this inquiry, the legislative classification is upheld unless the classification rests on grounds wholly irrelevant to the achievement of legitimate state objectives.

*State v. Harner*, 153 Wn.2d 228, 235-36, ¶ 12, 103 P.3d 738 (2004) (citing *Thorne,* 129 Wn.2d at 770-71). We first determine whether RCW 4.84.370 creates a class distinction requiring an equal protection analysis.

¶36 Habitat Watch argues that a "party's risk of paying attorney fees under RCW 4.84.370 is tethered directly to its success at the administrative level. Accordingly, a private party *challenging* a government decision will never have been the substantially prevailing party at the administrative level." Reply Br. of Habitat Watch at 34. The county responds by arguing that RCW 4.84.370 does not create a discernible distinction between classes of litigants. Rather, "the 'class' of land use litigants which end[s] up aligned

with the government is not preordained. It is ever-changing" depending on the local government's final determination under applicable law. Skagit County's Sur-Reply Br. at 3.

¶37 Whether a private party is *initially* aligned with the local government does not determine whether the private party will have prevailed before the county, city, or town, as one or more levels of administrative review may reverse or significantly alter the local government's initial permit determination. This may be demonstrated by a short example. If a landowner's permit application is first denied by a land use planner, the landowner can appeal that decision to a hearing examiner, city council, county board, or other administrative body—depending on the administrative review process the county, city, or town has in place. Another private party, although not the permit applicant, might have an interest in the outcome of the permit decision and argue before the reviewing body that the initial permit decision should be affirmed. If the landowner is successful in getting the denial reversed, and that becomes the "land use decision" within the meaning of LUPA (because there is no further opportunity for review within the local government), then the landowner has prevailed before the "county, city, or town" despite the fact that it disagreed with the local government's initial determination. RCW 36.70C.020(1); RCW 4.84.370(1)(a). This landowner will never be subject to paying attorney fees. The party opposing the permit, on the other hand, might bring a LUPA petition seeking reversal of the local government's final determination. It will not be considered a prevailing party before the county, city, or town, and might be subject to attorney fees if it appeals the decision to the Court of Appeals and is unsuccessful at each level.

¶38 The situation would be reversed if the land use planner's decision to deny the permit was affirmed through any and all levels of administrative review. In that case, the landowner would be the land use petitioner and the private party opposing the permit is the prevailing party before the

local government. The private party would be eligible for attorney fees against the landowner if the landowner continued to appeal the land use decision to the Court of Appeals or higher and was unsuccessful at each level of judicial review. A party's eligibility for attorney fees is certainly tied to whether that party prevailed before the county, city, or town, but because any private party has the opportunity to prevail before the county, city, or town, RCW 4.84.370 does not create a discernible, predetermined classification between private litigants. Therefore, Habitat Watch's argument that RCW 4.84.370 discriminates between private parties challenging local government decisions and those aligned with local governments fails.

¶39 Although unclear, it appears that Habitat Watch also argues that RCW 4.84.370 distinguishes between private land use litigants and the counties, cities, and towns whose decisions are on appeal. Habitat Watch fails to expand upon this claim, concluding without support that "the government will never be a losing party because it will always prevail before itself at the administrative level. Consequently, the law shifts awards only one way: from a private party to the government and those aligned with the government." Reply Br. of Habitat Watch at 34. "[T]his court will not review issues for which inadequate argument has been briefed or only passing treatment has been made." *State v. Thomas*, 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004) (citing *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992); *State v. Olson*, 126 Wn.2d 315, 321, 893 P.2d 629 (1995)). Habitat Watch has failed to adequately brief its conclusion that local governments may never be liable to pay attorney fees and, therefore, we decline to address it.[10]

¶40 Accordingly, we decline to decide on the briefing we received whether RCW 4.84.370 is unconstitutional.

---

[10] Habitat Watch seemed to be cognizant of its inadequate briefing on the attorney fee issue, including in its reply brief a footnote stating "[i]n the event that the court reaches this issue, Habitat Watch will request the opportunity to submit additional briefing on the constitutionality of RCW 4.84.370, due to the space limitations of this reply brief." Reply Br. of Habitat Watch at 36 n.41. However, this statement of intent to make a request is insufficient.

## IV. CONCLUSION

¶41 We affirm the judgments of the trial court dismissing Habitat Watch's LUPA petition and supplemental LUPA petition in their entirety. We award attorney fees and costs under RCW 4.84.370 and in accordance with RAP 18.1.

ALEXANDER, C.J.; C. JOHNSON, MADSEN, BRIDGE, and OWENS, JJ.; and IRELAND, J. PRO TEM., concur.

¶42 CHAMBERS, J. (concurring) — I feel like a little boy painting a floor only to discover he has painted himself into a corner. I fear now only the legislature can rescue me from this corner. Changing analogies, we can go methodically from tree to tree and just get lost deeper in the forest. In this analogy, the trees are precedents and the forest is the legislative purpose in adopting the Land Use Petition Act (LUPA), chapter 36.70C RCW.

¶43 Getting lost was easy. Cases and controversies are often argued only by parties who simply want to win their case; they are interested only in the next tree (the immediate result) and have little concern for the forest. It has also been easy because we have often interpreted the plain meaning of the statute section by section, without appropriate consideration for the legislature's overall plan contained within the four corners of the act. *Contra Dep't of Ecology v. Campbell & Gwinn, L.L.C.,* 146 Wn.2d 1, 11-12, 43 P.3d 4 (2002). I signed some of the precedents I now lament.

¶44 I am now of the view that we have interpreted "land use decision" and "aggrieved party" far too broadly. In so doing we have lost the fundamental principle that LUPA overlays and, read correctly, is in accord with basic due process protections.

¶45 The legislative purpose in enacting LUPA was to "establish[ ] uniform, expedited appeal procedures and uniform criteria for reviewing such decisions, in order to

provide consistent, predictable, and timely judicial review." RCW 36.70C.010. The legislature did not intend that parties had to pursue an administrative and judicial review of every ministerial decision. It is my view now that the 21-day limit for seeking review was intended to apply to quasi-judicial decisions made by those with the highest and final authority. *Contra Chelan County v. Nykreim,* 146 Wn.2d 904, 927, 52 P.3d 1 (2002).

¶46 First, the act states, " 'Land use decision' means a final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals." RCW 36-.70C.020(1). This language set the stage for quasi-judicial review, not review of mere ministerial actions. *See Nykreim,* 146 Wn.2d at 943 (Alexander, C.J., dissenting). However, I recognize that unless review is sought, the most minor decision made by the person with the least authority is a "land use decision."

¶47 Second, the legislature stated that LUPA was to replace writs of certiorari—the common law writ of certiorari is now codified in chapter 7.16 RCW as the writ of review. RCW 36.70C.030(1). Writs of review are generally limited to quasi-judicial determinations and do not apply to review of ministerial decisions. *See, e.g., State ex rel. New Wash. Oyster Co. v. Meakim,* 34 Wn.2d 131, 134, 208 P.2d 628 (1949).

¶48 Subsequent to our conclusion that LUPA may apply even to a ministerial decision in *Nykreim,* we held in *Samuel's Furniture, Inc. v. Department of Ecology,* 147 Wn.2d 440, 450, 54 P.3d 1194 (2002), that the Department of Ecology was barred from asserting that a shoreline building permit was required before a project could go forward because the Department of Ecology had failed to seek review of various ministerial decisions, including a decision to issue a fill and grade permit, to issue a building permit, and to rescind a stop work order. *Samuel's Furniture,* 147 Wn.2d at 472 (Owens, J., dissenting). But requiring parties to seek review of ministerial acts is often a

waste of time and judicial resources and may lead to absurd results. *Cf. Nykreim,* 146 Wn.2d at 943 (Alexander, C.J. dissenting); *see also James v. Kitsap County*, 154 Wn.2d 574, 115 P.3d 286 (2005).

¶49 Third, it is my view we have interpreted "aggrieved party" too broadly. Again, read in context, I now conclude that the legislature intended to limit those to whom the 21-day limit would apply by limiting LUPA to those who had "standing." This includes:

(1) The applicant and the owner of property to which the land use decision is directed;

(2) Another person aggrieved or adversely affected by the land use decision, or who would be aggrieved or adversely affected by a reversal or modification of the land use decision. A person is aggrieved or adversely affected within the meaning of this section *only when all of the following conditions are present*:

(a) The land use decision has prejudiced or is likely to prejudice that person;

(b) That person's asserted interests are among those that the local jurisdiction was required to consider when it made the land use decision;

(c) A judgment in favor of that person would substantially eliminate or redress the prejudice to that person caused or likely to be caused by the land use decision; and

(d) The petitioner has exhausted his or her administrative remedies to the extent required by law.

RCW 36.70C.060 (emphasis added).

¶50 Under the statutory scheme, in order to seek review of a final determination from those with the highest authority to make the determination, one must, by necessity, be an owner, applicant, or specifically defined aggrieved party. If you are not an owner or applicant you must satisfy all of the criteria of RCW 36.70C.060(2)(a)-(d). While the criteria are somewhat broad, this further evidences the legislature's intent to limit the application to a certain set of people.

¶51 But in *Nykreim,* we effectively held that even those who were not "aggrieved or adversely affected" as typically

understood, and who therefore would not have had standing under LUPA, were still bound by LUPA. *Nykreim,* 146 Wn.2d at 938. In *Samuel's Furniture,* 147 Wn.2d 440, we effectively approved the practice of giving no notice, even to those entitled to it by law, by nonetheless finding LUPA barred an appeal of a land use decision.

¶52 We should revisit our precedents with the forest in mind. LUPA is a legislatively crafted compromise that values efficiency, certainty, and notice. *See generally* ch. 36.70C RCW; ch. 51.04 RCW. But we should not apply LUPA to bar the courthouse door to those who had no notice, especially when the decisions at issue were decisions made by lower level staffers.

¶53 In this case, I concur with the majority in result. I am of the view that the issuance of the grading permit was not a land use decision from which a LUPA challenge of the underlying project was appropriate. I agree with the majority that Habitat Watch should have filed a LUPA appeal within 21 days of June 21, 2002, when it received a response to its public disclosure request documenting that the permit had been twice extended. However, it is not my view that the 21-day limit to appeal a land use decision applies as a statute of limitation to those who did not have any notice of a land use action. The 21-day limitation is a reasonable time limit for filing a notice of appeal of a decision when the challenger has actual notice. But an appeal assumes that the appealing party has meaningful notice of the action, the issues are already framed, an opportunity to consider and arrange for representation has been afforded, some preliminary hearing or action has occurred, and the parties have had time to anticipate and consider appropriate responses to an adverse determination. The 21-day LUPA time limit is wholly inadequate for one whose first notice of a land use action is actual notice of work on the property and must discover what government action has been taken, arrange for representation, and determine the appropriate course of action to follow. Generally, if challengers can demonstrate that they were en-

titled to notice and did not receive it, I would not allow the 21-day LUPA shield to apply. But here, Habitat Watch had initial notice and contested an earlier permit extension and should have been prepared to respond when it got notice of the permit extensions, albeit years late.

¶54 Further, the overwhelming purpose of LUPA was to unburden land use decisions from protracted litigation. Once construction of a land development has clearly irrevocably begun, those aggrieved by but not given notice of land use decisions must be limited to claims of equity.[11]

¶55 Accordingly, I concur in result.

OWENS, J., concurs with CHAMBERS, J.

¶56 SANDERS, J. (concurring in part/dissenting in part) — I concur with the majority's dismissal of Habitat Watch's Land Use Petition Act (LUPA), chapter 36.70C RCW, petitions, though I believe the land use decision was "issued" when it was placed in the public record. But the majority errs when it chooses not to address the constitutionality of RCW 4.84.370, which allows local governments to recover attorney fees from private litigants but never pay them. While the briefing is admittedly imperfect, focusing on the standard of review and the inapplicable right to petition the government for redress of grievances rather than the pertinent question of whether there is a rational basis for preferring local governments over other litigants, Habitat Watch did raise the issue:

> [T]he government will never be a losing party because it will always prevail before itself at the administrative level. Consequently, the law shifts fee awards only one way: from a private party to the government and those aligned with the government.

Reply Br. of Habitat Watch at 34.

---

[11] I also agree that the challengers have not established that the attorney fees provision is unconstitutional.

¶57 Because the lack of any rational basis for preferring the government over private litigants is stark and because failing to address the issue will result in application of a clearly unconstitutional statute against Habitat Watch, I would address the issue and hold the statute violates the equal protection clause of the United States Constitution's fourteenth amendment.

## I. Entered in the public record

¶58 The majority notes that LUPA's statute of limitations begins to run on the date a land use decision is issued. RCW 36.70C.040(3); majority at 408. "Issued" is defined in the next subsection:

(4) For the purposes of this section, the date on which a land use decision is issued is:

(a) Three days after a written decision is mailed by the local jurisdiction or, if not mailed, the date on which the local jurisdiction provides notice that a written decision is publicly available;

(b) If the land use decision is made by ordinance or resolution by a legislative body sitting in a quasi-judicial capacity, the date the body passes the ordinance or resolution; or

(c) If neither (a) nor (b) of this subsection applies, the date the decision is *entered into the public record*.

RCW 36.70C.040(4) (emphasis added).

¶59 The majority states:

Here, it is not clear from the record or the briefing when the final two permit extensions were issued within the meaning of RCW 36.70C.040(4). There is nothing in the record that shows the extension decisions were mailed to all parties of record, or otherwise made publicly known, or passed by ordinance or resolution. *It is also unclear if and when the decisions were "entered" into the public record.*

Majority at 408 (emphasis added).

¶60 As the majority noted, Habitat Watch "submitted a public disclosure request to Skagit County to determine the authority for the golf course project and learned that the

project was going forward based on extensions of the 1993 permit." Majority at 403. Thus, it was through accessing *public records* containing the decision granting the extension that Habitat Watch learned of the extensions. It is axiomatic the decision must have been previously entered into such records for it to be discoverable under the public disclosure act (PDA), chapter 42.17 RCW, thus meeting the definition of "issued" under RCW 36.70C.040(4)(c).

¶61 The phrase "entered into the public record" is not defined in LUPA. "An undefined term in a statute will be given its usual and ordinary meaning, and the court may use a dictionary definition to determine the usual and ordinary meaning of the term." *Scoccolo Constr., Inc. v. City of Renton*, 125 Wn. App. 150, 157, 103 P.3d 1249 (2005) (citing *Shoreline Cmty. Coll. Dist. No. 7 v. Employment Sec. Dep't*, 120 Wn.2d 394, 842 P.2d 938 (1992)).

¶62 *Webster's Third New International Dictionary* 756-57 (2002) defines "enter" as "to cause to go into or be received into something" and "enter into" as "to form a constituent part or element of : become a part of." "[P]ublic record" is defined as "a record filed in a public office and open to public inspection." *Id.* at 1836.

¶63 The PDA requires that all public records[12] "shall [be made] available for public inspection and copying." RCW 42-.17.260, .270. Thus, under the common definition of the statutory terms, Skagit County's decision to grant the permit extensions was at some point "entered into the public record" pursuant to RCW 36.70C.040(4)(c).

¶64 There is no indication in the record extensions were not filed in a public office open to public inspection. Indeed, while Habitat Watch obtained the records through a public

---

[12] The PDA defines a "public record" as "any writing containing information relating to the conduct of government or the performance of any governmental or proprietary function prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." RCW 42.17.020(36). The PDA long predates LUPA, and Skagit County's land use decisions clearly meet this definition. While the plain meaning of "public record" is clear, if the term were considered ambiguous we could look to the related "public record" definition under the PDA. *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 43 P.3d 4 (2002).

records request, that request was sent by mail.[13] Ex. 315; Ex. 111, Attach. 1. Habitat Watch does not claim it visited the Skagit County Planning Department and was denied the opportunity to inspect or copy the records regarding the permit extensions.

¶65 Since the permit extensions were "entered into the public record" under RCW 36.70C.040(4)(c), they were "issued" as of the date they were entered. Even if the record before this court doesn't disclose that precise date, if it differed at all from the date the decisions were made, the date certainly preceded the date the county responded to Habitat Watch's public disclosure request. Thus, while I concur that the 21-day statute of limitations ran before Habitat Watch filed its land use petition, I would follow the plain language of the statute to determine the date from which the statute of limitations ran.

II. Favoring local governments in awarding attorney fees violates equal protection

¶66 I would find the LUPA attorney fees statute, RCW 4.84.370, unconstitutional because there is no rational basis to favor local governments and those aligned with them over other parties to a LUPA petition when determining an award of attorney fees.

¶67 The statute provides:

(1) Notwithstanding any other provisions of this chapter, reasonable attorneys' fees and costs shall be awarded to the prevailing party or substantially prevailing party on appeal before the court of appeals or the supreme court of a decision by a county, city, or town to issue, condition, or deny a development permit involving a site-specific rezone, zoning, plat, conditional use, variance, shoreline permit, building permit,

---

[13] These letters were mailed June 7, 2002 and were not received by the Skagit County Planning Department until June 10, 2002. Ex. 315. While Habitat Watch complains of the 14-day response time, Habitat Watch requested far more than merely the documents relating to the permit extension. Habitat Watch's public disclosure request requested virtually every document relating to the grading permit, the forest practices conversion application, an access permit, along with a copy of the 1993 decision on the special use permit and "any attachments or accompanying decisions." Ex. 111, Attach. 1.

site plan, or similar land use approval or decision. The court shall award and determine the amount of reasonable attorneys' fees and costs under this section if:

(a) The prevailing party on appeal was the prevailing or substantially prevailing party before the county, city, or town, or in a decision involving a substantial development permit under chapter 90.58 RCW, the prevailing party on appeal was the prevailing party or the substantially prevailing party before the shoreline[s] hearings board; and

(b) The prevailing party on appeal was the prevailing party or substantially prevailing party in all prior judicial proceedings.

(2) In addition to the prevailing party under subsection (1) of this section, the county, city, or town whose decision is on appeal is considered a prevailing party if its decision is upheld at superior court and on appeal.

RCW 4.84.370.

¶68 The statute creates two classes with respect to the payment of attorney fees: private litigants, who pay attorney fees if they oppose the local government decision and lose again at the superior court and Court of Appeals, and local governments, who never pay attorney fees under the statute.

¶69 Under the plain language of the statute, if the final administrative decision of the government disfavors one party, that party can *never* recover its attorney fees under the statute. However, the local government whose decision is upheld at the superior court and the appellate court is eligible for attorney fees under the statute, but local governments never *pay* attorney fees under the statute. Since the local government is both decision maker and party at the highest level of administrative review available under its ordinances, and since that final decision constitutes the "land use decision" under review, the local government cannot ever be required to pay reasonable attorney fees nor can a party not aligned with the government ever recover them.

¶70 Given the statutory interpretation required by the language of the attorney fees and LUPA's definition of a land use decision, the classification under the statute is clear. The government can never be required to pay attorney fees, unlike parties that challenge local government land use decisions.

¶71 Habitat Watch contends that this classification must be reviewed under strict scrutiny because the "fundamental libert[y]" of petitioning the government for redress of grievances is "at stake."[14] Reply Br. of Habitat Watch at 35. However, Habitat Watch does not explain how the prospect of paying attorney fees at the *appellate level* implicates the right to petition the government for redress of grievances. The Court of Appeals previously rejected this argument under a challenge to RCW 4.84.370 brought directly under the First Amendment, *Gig Harbor Marina, Inc. v. City of Gig Harbor*, 94 Wn. App. 789, 799, 973 P.2d 1081 (1999), and I find the reasoning of that opinion persuasive on this point.[15]

¶72 But this does not end the inquiry.

> The standard of review in a case that does not employ suspect classification or fundamental right is rational basis, also called minimal scrutiny. Under the rational basis test, the court determines (1) whether the legislation applies alike to all members of the designated class, (2) whether there are reasonable grounds to distinguish between those within and those without the class, and (3) whether the classification has a rational relationship to the purpose of the legislation.

*Philippides v. Bernard*, 151 Wn.2d 376, 391, 88 P.3d 939 (2004) (citation omitted).

¶73 Put another way, "[u]nder the rational basis test, the law must be rationally related to a legitimate state interest." *Des Moines Marina Ass'n v. City of Des Moines*, 124

---

[14] *See* U.S. Const. amend. I; Wash. Const. art. I, § 4.

[15] Further, such a holding would cast doubt on any attorney fees statute, and perhaps judicial enforcement of attorney fees clauses in private contracts, since all such statutes and clauses could "chill" a party's willingness to petition the court.

Wn. App. 282, 288, 100 P.3d 310 (2004). The "reasonable grounds" prong of the *Philippides* formulation is analogous to the "legitimate state interest" in the *Des Moines Marina* formulation. What is the "legitimate state interest" served by the LUPA attorney fees statute?

¶74 Skagit County claims that the intent of the statute "is to discourage repetitive meritless land use appeals, to compensate appellees for the tangible and intangible costs of litigation and to conserve judicial resources." Skagit County's Sur-Reply Br. at 4. *See also Gig Harbor Marina*, 94 Wn. App. at 800. Of course, the purpose isn't to discourage *all* appeals of land use decisions, but appeals of land use decisions to either the Court of Appeals or the Supreme Court, since nongovernmental parties get one opportunity to appeal a land use decision free of the risk of having to pay the other party's fees and costs if they are unsuccessful before the superior court. *See Baker v. Tri-Mountain Res., Inc.*, 94 Wn. App. 849, 854, 973 P.2d 1078 (1999).

¶75 Given that local governments never have to pay attorney fees under RCW 4.84.370, the purpose cannot have been to generally discourage "meritless" land use appeals, to compensate *all* appellees for litigation costs, or to conserve judicial resources in *all* land use cases. Rather, the statute was clearly designed to discourage land use appeals from those who oppose local government decisions and compensate local governments and those who side with them. This is simply a naked preference for local governments over private litigants opposing local government land use decisions.

¶76 A statute the rationale of which is simply to favor the government is not rational. In *Hunter v. North Mason High School*, 85 Wn.2d 810, 818-19, 539 P.2d 845 (1975), this court held the only possible rationale for a statute favoring the government (by setting a shorter statute of limitations for parties suing the government) was protecting the public treasury. This court held such nonclaim statutes violate equal protection:

In light of these considerations, the only function the special treatment given governmental bodies seems to perform is the simple protection of the government from liability for its wrongdoing. Our State has clearly and unequivocally abjured any desire to so insulate itself from liability, however, in its absolute waiver of sovereign immunity, which places the government on an equal footing with private parties defendant.

. . . .

Any policy of placing roadblocks in the way of potential claimants against the state having been abandoned, we cannot uphold nonclaim statutes simply because they serve to protect the public treasury. Absent that justification, there is no basis, substantial or even rational, on which their discrimination between governmental plaintiffs and others can be supported. They thus cannot stand under the equal protection clause of the Fourteenth Amendment or Const. art. 1, § 12.

*Hunter*, 85 Wn.2d at 817-19 (footnote omitted).

¶77 The lesson of *Hunter* is clear. A statute the purpose of which is to favor the government in litigation lacks rational basis.

¶78 Further, accepting solely for the sake of argument that deterring "meritless" land use appeals to the Court of Appeals or Supreme Court is a legitimate state purpose, is the statute rationally related to that purpose?

¶79 As noted, the statute does not deter "meritless" appeals from all parties, only from private parties not aligned with the government. Local government, which under the definition of a land use decision never "loses" at the administrative level, is undeterred by the statute. Local governments can lose at the superior court, the Court of Appeals, and the State Supreme Court and still never pay attorney fees. Even under rational basis review "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985).

¶80 The statute is so woefully underinclusive, and thus so attenuated from the asserted goal of deterring

"meritless" land use appeals to the Court of Appeals and Supreme Court, that the distinction is arbitrary and irrational. Indeed, since the local government is always a party to such land use appeals, and never pays attorney fees, the statute by definition is underinclusive in *every land use appeal* to the Court of Appeals and Supreme Court. I recognize that this court has rarely held underinclusive statutes to violate rational basis equal protection review, however my survey of the case law has found no classification scheme that by definition was so underinclusive that it failed to include one party *in every case* in which it was designed to apply.

¶81 Further, it is hard to conclude the statute is rationally related to its alleged goal of discouraging "meritless" appeals of land use decisions to the Court of Appeals and Supreme Court, rather than just a pretext for pure favoritism of local governments, when the *identical* deterrent effect could be achieved with a statute that simply awarded attorney fees to a party that prevailed in the superior court and the Court of Appeals.[16] Such a statute would still deter "meritless" land use appeals to the Court of Appeals and Supreme Court just as effectively. A party would still get one "free" appellate review to the superior court. The *only* difference would be that removal of the requirement to "prevail or substantially prevail" in front of the local government would make the local government susceptible to an award of attorney fees and would place local governments on equal footing with any private party.

¶82 Given this is a comprehensively underinclusive statute, and a virtually identical statute (absent the requirement that the party prevail before the county, city, or town) could serve the same purpose without the invidious classification, I conclude that the statute is not rationally related to its purpose of deterring "meritless" appeals to the Court

---

[16] And the Supreme Court, if a party sought review of a Court of Appeals decision.

430

of Appeals and Supreme Court. Thus, I dissent from the majority's decision to award attorney fees under RCW 4.84.370.

Reconsideration denied December 5, 2005.