

COURT OF APPEALS DIV I
STATE OF WASHINGTON

2015 MAR -9 AM 9: 20

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 71890-8-I |
| | ) | |
| M.P., d.o.b. 3/16/12, | ) | |
| | ) | |
| Minor Child. | ) | |
| | ) | |
| | ) | |
| WASHINGTON STATE DEPARTMENT | ) | |
| OF SOCIAL AND HEALTH SERVICES, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JULIO PRADO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: March 9, 2015 |

VERELLEN, A.C.J. — Julio Prado appeals a trial court's order finding his daughter M.P. dependent and ordering that she remain out of his care. Because substantial evidence supports the finding of dependency and Prado does not show the trial court abused its discretion in ordering M.P.'s continued out-of-home placement, we affirm.

## FACTS

M.P. was born on March 16, 2012 to Prado and Ami Frostad. On August 12, 2013, Frostad brought M.P. to the emergency room with a fractured left arm, a ruptured left eardrum, a bruise on her left cheek, and swelling and bruising to her left ear. A doctor concluded that the injuries to M.P.'s cheek and ear were consistent with a

forceful slap to the side of the head. The Department of Social and Health Services (DSHS) filed a dependency petition and took M.P. into custody. Prado and Frostad had ended their relationship in February 2013, and at the time of the dependency petition, Prado had not seen M.P in five months.

A shelter care hearing was held on August 15, 2013. M.P. was placed in the temporary custody of a relative. Prado was permitted supervised visitation four times per week for four hours each visit. After the hearing ended, Prado waited outside the courtroom in the hallway for Frostad and her boyfriend to leave the courtroom. He accosted Frostad's boyfriend in a "very threatening tone," saying, "Just you wait and see what's going to happen to you; just you wait and see."[1]

Frostad agreed to the establishment of dependency on October 16, 2013. A dependency fact-finding hearing as to Prado was held on February 11 and 12, 2014. Prado testified that he had grave concerns about M.P.'s safety with Frostad. He claimed that, as a baby, M.P. had been attacked by a pit bull at Frostad's home and that he had to bring M.P. to the hospital for stitches. He also asserted that Frostad used drugs and associated with other drug users. Nevertheless, Prado was emphatic that he wanted M.P. to live with Frostad if the court did not place M.P. with him.

Prado acknowledged that his relationship with Frostad involved domestic violence and that it was a "regular part of [their] relationship" towards the end.[2] He admitted that he had punched and slapped Frostad, pulled her hair, and threatened her. He agreed that he had a "hot temper" and believed that domestic violence was

---

[1] Report of Proceedings (RP) (Feb. 11, 2014) at 126.

[2] Id. at 52.

2

something that occurred in most relationships.[3] Prado admitted to threatening Frostad's boyfriend after the shelter care hearing "because he was looking at my mother weird."[4] In a separate incident around the same time, Prado chased Frostad's boyfriend in a car on the highway at high speed for approximately 15 to 20 minutes in order to intimidate him.

Prado stated that he currently smoked marijuana at least every other day. He claimed to have a prescription for marijuana but admitted he did not have a medical condition, nor did he know the name of his prescribing physician. He testified that he used marijuana in order to sleep and that it "cloud[ed] his judgment" when he used the more "sleep-ish" types of marijuana.[5] Nonetheless, Prado did not believe marijuana use would impact his ability to take care of M.P. and stated that he would continue to use marijuana if M.P. was in his care because "why wouldn't I take my prescription from a doctor?"[6]

Despite the fact that he knew he could visit four times per week, Prado only visited M.P. a total of five to ten times in the prior six months. He stated that he did not believe the visitation opportunities were "mandatory or anything."[7] Prado had not voluntarily provided any financial support for M.P. and did not know her favorite food, her correct date of birth, what size diapers she wore, or anything about her regular daily

---

[3] Id. at 61.

[4] Id. at 56.

[5] Id. at 162.

[6] Id. at 161.

[7] Id. at 102.

schedule. When asked how long M.P. had been living with a relative, he said "I don't keep track over that stuff."[8]

Frostad testified that Prado had given her multiple black eyes and had once broken her eye socket. After Frostad learned she was pregnant with M.P., Prado and Frostad got into an argument, during which Prado grabbed Frostad by the hair and refused to let her leave the house he shared with his parents. Frostad testified that Prado's father then called her a "bitch," shoved her out of the house and slammed the door in her face.[9] She testified that as recently as October 2013, Prado had driven past her house and pointed his finger at her out the window as if he were "shooting a gun."[10] She stated that within the past couple of months Prado's brother and sister-in-law had intentionally swerved their car into her lane of traffic on more than one occasion.

Anne Sacquitne, the DSHS social worker assigned to M.P.'s case, testified that M.P. was an extremely active child who was "on the go constantly and needs quite a bit of supervision."[11] She noted that Prado's visits with M.P. were sporadic and took place in a structured environment where Prado relied entirely on the caregiver to bring food, clothing, and diapers for M.P. She also testified as to her concern about the safety of the home where Prado lived with his parents, brother and sister-in-law because Prado's father had assaulted Prado's brother on at least two occasions and had once shoved Frostad.

---

[8] Id. at 21.

[9] Id. at 207.

[10] Id. at 217.

[11] Id. at 265.

At the conclusion of the fact-finding hearing, the trial court found M.P. dependent as defined in RCW 13.34.030(5)(c) because (1) Prado had a history of violent outbursts towards others, including family members, (2) Prado's marijuana use would affect his ability to ensure M.P.'s safety and development, and (3) Prado had made only minimal attempts to maintain a relationship with M.P. and had not demonstrated the motivation or awareness necessary to parent a very active toddler full time. The parties subsequently submitted briefing and exhibits for the dispositional hearing. The trial court found that it was contrary to M.P.'s welfare to be placed in Prado's home because "there is no parent or guardian available to care for the child" and ordered that M.P. remain in out-of-home care.[12] Prado appeals the trial court's dependency and dispositional orders.

## ANALYSIS

To declare a child dependent, a court must find by a preponderance of the evidence that the child meets one of the statutory definitions of a "dependent child" set forth in RCW 13.34.030.[13] A "dependent child" includes a child who "has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development."[14] A trial court's finding of dependency is highly fact specific; there are no specific factors that a court must consider when determining whether a child is dependent.[15]

---

[12] Clerk's Papers (CP) at 324.

[13] RCW 13.34.110(1).

[14] RCW 13.34.030(6)(c).

[15] In re Dependency of Schermer, 161 Wn.2d 927, 951-52, 169 P.3d 452 (2007).

We will affirm an order of dependency so long as substantial evidence supports the court's findings of fact and the findings support the conclusions of law.[16] "Evidence is substantial if, when viewed in the light most favorable to the party prevailing below, a rational trier of fact could find the fact more likely than not to be true."[17] We do not weigh the evidence or evaluate witness credibility.[18] Unchallenged findings are verities on appeal.[19]

Prado argues that the evidence was not sufficient to support the trial court's finding that M.P. is a dependent child.[20] We disagree. First, Prado engaged in repeated physical acts of violence against Frostad and believed that such violence was a typical part of most relationships. Though Prado claimed that he had learned to control his temper, this was contradicted by evidence that Prado had threatened Frostad's boyfriend in the courthouse and chased him on the highway in the few months prior to trial. Violence was also frequently committed by other members of Prado's household, including his father, brother, and sister-in-law. A reasonable fact finder could believe that if M.P. was in Prado's care, she would either be exposed to violence against others or she would become the victim of violence herself.[21]

---

[16] In re Dependency of M.S.D., 144 Wn. App. 468, 478, 182 P.3d 978 (2008).

[17] Id.

[18] In re Welfare of C.B., 134 Wn. App. 942, 953, 143 P.3d 846 (2006).

[19] In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

[20] Though Prado assigns error to several findings of fact, his argument focuses on the trial court's ultimate finding that M.P. was a dependent child. Thus, we address only whether substantial evidence supports that finding.

[21] Prado claims that there was no evidence that he had ever acted violently around or towards M.P. But a dependency finding under RCW 13.34.030(6)(c) does not require proof of actual harm, "only a 'danger' of harm." Schermer, 161 Wn.2d at 951.

In addition, Prado used marijuana frequently and was equivocal about whether he planned to stop using it were he caring for M.P. Prado contends that marijuana use is lawful and that there was no evidence that it negatively impacted his parenting abilities. Again, we disagree. Prado admitted that marijuana made him sleepy and affected his judgment. This, in combination with the fact that M.P. is an extremely active toddler that needs close supervision, supported the trial court's finding that Prado's "regular marijuana use will significantly impact his ability to parent [M.P.]"[22]

Finally, Prado failed to visit M.P. consistently or learn about her needs. Prado does not challenge the trial court's finding that he did not know M.P.'s correct birth date, favorite food, or daily schedule and that he had made no efforts to get this information. Prado's own testimony demonstrates a lack of knowledge about the needs of a two-year-old child and a lack of interest in acquiring the responsibilities of a full-time parent. Viewed together, this constellation of factors demonstrated that Prado is not capable of adequately caring for M.P. and that he posed a substantial risk to her well-being. Substantial evidence supported the trial court's finding of dependency.

After a court finds a child to be dependent, it must enter an order of disposition.[23] The court may order the child to be removed from a parent's home if the court finds that (a) there is "no parent or guardian available to care for such child," (b) that the "parent, guardian, or legal custodian is not willing to take custody of the child," or (c) that, "by clear, cogent, and convincing evidence, a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home."[24]

---

[22] CP at 323.

[23] RCW 13.34.130.

[24] RCW 13.34.130(5).

7

When determining an appropriate placement, the best interests of the child are of paramount concern.[25] A trial court's placement decision in a dispositional proceeding is discretionary and will be overturned only upon a showing of an abuse of discretion.[26] A trial court abuses its discretion if its ruling is "manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons."[27]

Prado contends that the trial court abused its discretion in ordering out-of-home placement pursuant to RCW 13.34.130(5)(a) because M.P. had "no parent or guardian available to care for [her]."[28] He argues that the State failed to show he was not "available" because he "[h]e was not incarcerated, he was not away from the area for work, he was not in the military, bedridden or institutionalized in a hospital, or otherwise unreachable."[29] To the extent that Prado raises an issue of statutory interpretation, Prado's briefing is insufficient to afford review. When interpreting a statute, our objective is to ascertain and give effect to the legislature's intent.[30] "If the meaning of the statute is plain, the court discerns legislative intent from the ordinary meaning of the words."[31] But "[i]f the statute is still susceptible to more than one interpretation after we conduct a plain meaning review, then the statute is ambiguous and we rely on statutory

---

[25] In re Dependency of R.W., 143 Wn. App. 219, 223, 177 P.3d 186 (2008); RCW 13.34.020.

[26] In re Dependency of A.C., 74 Wn. App. 271, 275, 873 P.2d 535 (1994).

[27] State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).

[28] CP at 324.

[29] Appellant's Br. at 36.

[30] Tesoro Ref. and Mktg. Co. v. State, Dep't of Revenue, 164 Wn.2d 310, 317, 190 P.3d 28 (2008).

[31] Id.

construction, legislative history, and relevant case law to determine legislative intent."[32] Prado does not specify whether the meaning of "available" is plain or ambiguous, nor does he offer any cogent legal analysis or cite to relevant authority.[33] "'[T]his court will not review issues for which inadequate argument has been briefed or only passing treatment has been made.'"[34] Thus, we are unable to address the question of whether the trial court erred in using RCW 13.34.130(5)(a) as a basis for M.P.'s out-of-home placement.

Affirmed.

WE CONCUR:

COX, J.

---

[32] State v. Rice, 180 Wn. App. 308, 313, 320 P.3d 723 (2014).

[33] The State contends "the plain meaning of the term 'available' means 'present or ready for use.'" Respondent's Br. at 16. This would seem to imply the existence of more than one reasonable interpretation of the term.

[34] Habitat Watch v. Skagit County, 155 Wn.2d 397, 416, 120 P.3d 56 (2005) (alteration in original) (quoting State v. Thomas, 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004)).