[No. 60656-5-I. Division One. September 2, 2008.]

HELLER BUILDING, LLC, *Respondent*, v. THE CITY OF BELLEVUE, *Appellant*.

48

*Lori M. Riordan*, City Attorney, and *Cheryl A. Zakrzewski* and *Mary Kate Berens*, *Assistants*; and *Michael R. Kenyon* and *Bob C. Sterbank* (of *Kenyon Disend, PLLC*), for appellant.

*H. Troy Romero* (of *Romero Park & Wiggins, PS*), for respondent.

*Julie M. Nichols* on behalf of Building Industry Association of Washington, amicus curiae.

¶1 LEACH, J. — Heller Building, LLC (HBL) obtained a building permit to remodel a downtown Bellevue property for use as an office for the Seattle Street of Dreams. HBL brings a petition under the Land Use Petition Act (LUPA), chapter 36.70C RCW, challenging the city of Bellevue's decision ordering work stopped on its project. We hold that HBL's petition was timely, but that HBL fails to show that it is entitled to relief under LUPA.

## Background

¶2 John Heller is the owner of HBL. On December 22, 2005, Heller submitted to the city of Bellevue (City) an application for predevelopment services for property located at 35 100th Avenue NE, Bellevue. At the time, Heller was under contract to purchase the property, and the Meydenbauer Dental Clinic building was situated there. He attached a letter to the predevelopment services application, asking the City to respond to several questions regarding the feasibility of potential uses and development options for the property.

¶3 The City sent a detailed response to Heller's request on January 17, 2006. The City explained that any remodel of the existing nonconforming structure that would exceed 100 percent of its replacement value would trigger compliance with current building code and land use regulations. Heller inquired as to whether he could build a two-story office building with 3,000 square feet of space, to which the City responded that the maximum floor area that could be achieved on the existing footprint was 2,350 square feet. The City informed Heller that if the existing building were

completely torn down, current setback requirements would leave only 32 square feet on which to build a new structure.

¶4 Heller subsequently e-mailed the City on January 26, 2006, asking it to clarify its response to some of his questions. In the City's e-mail response of February 7, 2006, the City clarified that any remodel of a nonconforming structure may not exceed 100 percent of the replacement value without triggering full compliance with current regulations, but that because his project also involved a nonconforming site, a remodel exceeding 30 percent of the existing building's replacement value would trigger proportional compliance requirements under Bellevue City Code (BCC) 20.20.560(C). In the weeks following, Heller and his architect remained in close contact with the City as they developed a plan to remodel the existing building up to 30 percent of its replacement value.

¶5 In June 2006, HBL filed a building permit application. The description of the proposed work stated, "face lift and remodel of existing building no footprint change - change from flat to pitch [sic] roof." The proposed construction was valued at $153,480.17, which was 29.84 percent of $514,305.26, the stated replacement value of the existing building. The remodel and replacement cost analyses were furnished by HBL's architect, Clynn Wilkinson of 4D Architects.

¶6 The City requested additional information from HBL's architect on August 16, 2006, including a request for "engineering or an engineers [sic] statement indicating that the existing foundation is capable of supporting the additional loads that are proposed with the additional floor and the revised roof layout." Wilkinson responded,

> I performed the gravity calculations. I have a copy of the plans that were used to build large portions of the original building. The detail and specifications on these plans appear to comply with the requirements as set forth IBC. The foundation appears to be sound and does not have any significant cracks.

Although Wilkinson provided calculations and analysis by Dwayne Barnes of Stoney Point Engineering in response to

other requests by the City, there is no evidence that HBL had an engineer analyze the building's foundation in response to its request regarding the foundation.

¶7 A building permit was issued on November 3, 2006, and HBL began construction. In December, HBL's contractor demolished all of the exterior walls, although the approved plans detailed removal of only some exterior walls. After taking down the walls, HBL contacted city officials to inform them that it had discovered that the existing foundation was unsafe. City inspectors agreed that additional work was needed to make the foundation safe and suggested HBL submit revised plans showing the proposed foundation repairs. The City approved HBL's revised plans and HBL proceeded to complete the repairs, including pouring a new slab.

¶8 On January 22, 2007, the city council passed a moratorium immediately preventing future development on 13 properties in downtown Bellevue, including the property at issue here. The purpose of the moratorium was to give the City time to conduct a study to support the City's goal to "increase the connections to the Meydenbauer waterfront and improve the livability of the Meydenbauer Bay neighborhood."

¶9 On February 8, 2007, Patti Wilma, land use planning manager, sent an internal e-mail to Gregg Schrader, building official, requesting a stop work order for the property. Wilma stated that she believed the permit was based on inaccurate information from the applicant and that work should be stopped while the value of improvements and replacement value were assessed and the level of compliance required under the land use code was determined. Schrader responded that stop work orders were posted according to the following procedure: first, the land use department would notify the owner and contractor by phone; then Schrader's department (building) would post the stop work order; and finally, land use would send a letter clearly identifying why work was stopped and what needed to be done to have the order lifted.

¶10 Carol Helland, land use director, then attempted to contact Heller and his architect. She agreed to meet with Heller and his contractor in person on Monday, February 12, 2007, at 9:00 a.m., before posting the stop work order. However, the meeting did not take place, and the stop work order was posted at 8:30 a.m. on Tuesday, February 13, 2007. For "Reason Posted," the stop work order stated, "EXCEEDING PERMITTED SCOPE OF WORK!" The "Correction Required" was to "PROVIDE REVISIONS TO COMPLY WITH CURRENT CITY OF BELLEVUE CON-STRUCTION AND LAND USE CODES AND ORDI-NANCES." In the space provided for a completion date it said, "CONTACT CITY."

¶11 Heller submitted a lengthy memo to the City on February 14, 2007, explaining his view of the project's history and why he thought the City should not have issued the stop work order. He asked that the City either imme-diately lift the stop work order or immediately meet with him to discuss "finding some common ground" on which the City could agree to lift the order. He threatened to file suit if the City did not find a way to lift the stop work order. On February 15, 2007, HBL's attorney sent a letter to the City stating that HBL was filing a claim for damages with the City and urging the City to lift the stop work order. The next day, Helland wrote on behalf of the City to inform HBL that because a claim for damages had been filed, the City's response to HBL or its attorney had to be coordinated with the city attorney.

¶12 The City sent HBL a letter on March 2, 2007, explaining its decision to stop work on the project. The letter stated that HBL's project could no longer be consid-ered the remodel of an existing nonconforming structure or site within the meaning of BCC 20.20.560 because the work actually performed on the project exceeded the scope of the permit. It further stated that under the moratorium the City was prohibited from accepting "certain of the permits necessary for you to recommence construction on your site." The letter outlined the steps that would be necessary in

order to recommence construction after the moratorium expired, including submission of a design review application complying with chapters 20.25B and 20.30F BCC, BCC 20.20.070, and either BCC 20.20.010 or chapter 20.30G BCC.

¶13 On March 23, 2007, HBL filed a LUPA petition asking the superior court to rule that the City erred in concluding (1) that its project could no longer be considered a remodel of an existing structure within the meaning of BCC 20.20.560, and therefore was not entitled to any status as a nonconforming building or site; (2) that the work actually performed exceeded the scope of HBL's building permit; and (3) that the City was prevented from taking in or processing certain of the permits necessary for HBL to recommence construction on its site.

¶14 The City moved to dismiss HBL's petition on the ground that it was not filed within 21 days of the stop work order. The superior court denied the City's motion on the basis that the stop work order was not a "land use decision" under RCW 36.70C.020(1). The court concluded that the March 2, 2007, letter was a final land use decision from which a timely appeal was taken, that the decision was not supported by substantial evidence, and that the City's application of the law to the facts was clearly erroneous. The City appeals the superior court's denial of its motion to dismiss and the court's findings of fact and conclusions of law.

## Discussion

¶15 In reviewing an administrative decision, this court stands in the same position as the superior court.[1] We

---

[1] *Habitat Watch v. Skagit County*, 155 Wn.2d 397, 405-06, 120 P.3d 56 (2005) (quoting *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000)).

review the City's factual findings for substantial evidence and its conclusions of law de novo.[2]

## A. *Was HBL's LUPA Petition Timely?*

 ¶16 The purpose of Washington's LUPA is

to reform the process for judicial review of land use decisions made by local jurisdictions, by establishing uniform, expedited appeal procedures and uniform criteria for reviewing such decisions, in order to provide consistent, predictable, and timely judicial review.[3]

LUPA's 21-day statute of limitations begins to run on the date that a land use decision is issued.[4] A written land use decision is "issued" either three days after it is mailed or on the date that the local jurisdiction provides notice that the decision is publicly available.[5]

 ¶17 The City argues that HBL's LUPA petition was untimely because it was not filed within 21 days of the issuance of the stop work order. HBL argues that the stop work order was not a "land use decision" under RCW 36.70C.020(1) because it was neither a "final determination" nor issued by the City's "officer with the highest level of authority to make the determination."[6] Rather, HBL argues that the March 2, 2007, letter was the land use decision that triggered the statute of limitations. We agree that the stop work order was not a final determination because it did not specify which ordinances HBL was alleged to have violated and it did not state what steps needed to be taken to correct the violation as required by BCC 23.05.180(B).

¶18 RCW 36.70C.020(1) provides, " 'Land use decision' means a final determination by a local jurisdiction's body or

---

[2] *Wenatchee Sportsmen*, 141 Wn.2d at 176.

[3] RCW 36.70C.010.

[4] RCW 36.70C.040(2)-(4); *Habitat Watch*, 155 Wn.2d at 408.

[5] RCW 36.70C.040(4)(a); *Habitat Watch*, 155 Wn.2d at 408.

[6] RCW 36.70C.020(1).

officer with the highest level of authority to make the determination." Our Supreme Court has held, in the context of applying LUPA, that "[a] final decision is 'one which leaves nothing open to further dispute and which sets at rest cause of action between parties.' "[7]

¶19 The City argues that the stop work order is a final land use decision because similar orders were considered land use decisions in *Richards v. City of Pullman*[8] and *Post v. City of Tacoma.*[9] However, neither *Richards* nor *Post* addresses the question we address here, which is whether the stop work order issued by the City contained sufficient information to constitute a "final determination." The City boldly states that the stop work order "was identical in content to the notice of violation and order issued in *Richards.*" However, the court's opinion in *Richards* contains insufficient facts by which to verify this assertion, and it does not appear that the contents of the notice and order were at issue in that case. The Richardses argued that LUPA did not apply because Pullman was required by the zoning code to enforce the violation in a court of limited jurisdiction, which excepted it from review under LUPA.[10] In *Post*, the question was whether the decision was final under the penalty scheme set out by the Tacoma Municipal Code.[11]

¶20 The BCC requires that "[t]he stop work order shall state the reason for the order, and the conditions under which the cited work will be permitted to resume."[12] Here, the stop work order stated that HBL had exceeded the scope of its permit but did not state in what way the scope had been exceeded. It stated that HBL needed to provide

---

[7] *Samuel's Furniture, Inc. v. Dep't of Ecology*, 147 Wn.2d 440, 452, 54 P.3d 1194 (2002) (quoting BLACK'S LAW DICTIONARY 567 (5th ed. 1979)).

[8] 134 Wn. App. 876, 142 P.3d 1121 (2006).

[9] 140 Wn. App. 155, 165 P.3d 37 (2007).

[10] *Richards*, 134 Wn. App. at 881; *see also* RCW 36.70C.020(1)(c).

[11] *Post*, 140 Wn. App. at 163.

[12] BCC 23.05.180(B) (*available at* http://www.bellevuewa.gov).

revisions to comply with current codes and ordinances but did not specify any provision of the BCC. Where it should have stated a deadline for completing the corrections, it merely stated, "CONTACT CITY." The stop work order did not contain the information that the BCC required, which would have informed HBL of the substance of its violation in a way that would allow HBL to correct the violation or make an informed decision whether to challenge the City's decision. While a stop work order may be a final determination in some circumstances, here the City's stop work order was not final and therefore it was not a land use decision under RCW 36.70C.020(1).

¶21 The March 2, 2007, letter, on the other hand, contained the information that the BCC requires in a stop work order. The City argued, in its brief and again in oral argument, that the letter was not a decision by the City but merely a response to requests by HBL and its attorney for a more detailed explanation of its already final decision. This argument is inconsistent with the letter itself, which states that it "supplements the Stop Work order" and that it is *not* "intended as a response to any previous communications from Heller Building LLC."

¶22 The City forebodes that a decision holding that the stop work order was not a final decision would discourage municipalities from offering any explanations for land use decisions, "so as not to risk unwinding final decisions and increasing their exposure to LUPA petitions and damages claims." However, the City's own code requires more explanation than the City provided in the stop work order it issued here. Instead of issuing a stop work order that complied with its code, the City incorporated code-mandated elements of a stop work order into its subsequently issued letter.

¶23 Finally, as evidenced by internal e-mails, the practice implemented by the City to comply with the requirements of the BCC regarding stop work orders is a three-step process culminating in a letter decision. The City's practice was to (1) call the owner and contractor in order to avoid

surprise and confrontations with City officials in the field, (2) post the stop work order, and (3) send a letter of explanation.

¶24 Because the letter contained the code-mandated reasons for the decision and conditions for resuming work that were omitted from the stop work order and because the record indicates that the City intended the letter rather than the stop work order to be a final determination, we hold that the letter was a final determination and the stop work order was not. The letter was signed by Building Official Gregg Schrader. The parties agree that Schrader is the highest official with authority to issue a stop work order under BCC 23.05.180.[13]

¶25 We hold that the March 2, 2007, letter was a land use decision under RCW 36.70C.020(1) because it was a final determination by the officer with the highest level of authority to make the determination. Therefore, HBL's petition, which was filed on March 23, 2007, was timely filed within 21 days of the land use decision.

B. *Was the City's Decision Proper on Its Merits?*

¶26 In reviewing a LUPA petition, the court may grant relief only if the party seeking relief has carried the burden of establishing one of the following standards:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

---

[13] HBL argues that the stop work order is not a land use decision because it was issued by Schrader's designee, Tom Miller, rather than Schrader himself. Because we conclude that the stop work order was not a final determination, we need not determine whether the stop work order was issued by the official or body with the highest authority to make the determination.

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party seeking relief.[14]

In order to grant relief, it is not necessary for the court to find that the City engaged in arbitrary and capricious conduct.[15]

¶27 HBL's LUPA petition asked the superior court to rule that the City erred in concluding (1) that the work actually performed exceeded the scope of HBL's building permit, (2) that its project could no longer be considered a remodel of an existing structure within the meaning of BCC 20.20.560, and therefore was not entitled to any status as a nonconforming building or site, and (3) that the City was prevented from taking in or processing certain of the permits necessary for HBL to recommence construction on its site.

### 1. *Scope of permit*

¶28 We must determine whether substantial evidence supports the City's determination that HBL exceeded the scope of its permit when it demolished additional exterior walls, repaired the foundation, and poured a new slab.

¶29 HBL's permit authorized a "[f]ace lift and remodel of existing building, demo and construction of walls, change from flat roof to pitch [sic] roof." During the permitting process, the City questioned the stability of the existing foundation, asking HBL to provide an engineer's statement indicating that the foundation could support the planned remodel. Without obtaining an engineer's statement, HBL's architect assured the City that the foundation was sound.

---

[14] RCW 36.70C.130(1).

[15] RCW 36.70C.130(2).

The City approved HBL's plans and issued a building permit.

¶30 The scope of work under HBL's permit was limited by BCC 20.20.560, which governs the extent to which nonconforming structures and sites can be remodeled without requiring the structure or site to be brought into compliance with current code requirements. Both parties were aware that HBL's plans were tailored to keep the cost under 30 percent of the replacement value in order to avoid triggering proportional compliance for the nonconforming site. The City determines whether a remodel exceeds 30 percent of replacement value of the existing structure by comparing the estimated cost of the improvements to the replacement value. The parties agreed on a replacement value of $514,305.26 and an estimated remodel cost of $153,480.17. They further agreed that this meant that the value of the remodel was 29.84 percent of the replacement value of the existing structure, just below the 30.00 percent threshold. HBL did not challenge the City's method for determining this percentage during the permitting process or in its LUPA petition.[16]

¶31 During construction, HBL alerted the City that the building's foundation was unsound and could not safely support the remodeled building. In order to make the foundation safe, HBL had to demolish all (as opposed to some or most) exterior walls,[17] repair the foundation, and pour a new slab. Because the cost of this additional work was not included when HBL and the City determined the remodel was 29.84 percent of the replacement value, we

---

[16] During oral argument, HBL argued that BCC 20.20.560(C) is ambiguous as to whether the cost of the remodel or some other number should be used to calculate the value of the remodel. Absent a change in applicable law, we will not consider arguments raised for the first time during oral argument. *State v. Olson,* 126 Wn.2d 315, 319-20, 893 P.2d 629 (1995).

[17] The parties dispute whether the demolition of additional exterior walls was orally approved by the City and whether they were demolished before or after the City's approval of the revised plans detailing the foundation repair. However, as explained herein, it is immaterial whether the City approved the plans because HBL had a duty to comply with the code regardless of inspections or approvals by the City.

conclude that the additional work exceeded the scope of the building permit.

¶32 HBL offers several arguments for its position that this additional work did not exceed the scope of its building permit. HBL argues that it had a "vested right" to build the building shown in its original plans, regardless of any increase in the cost of the project; that the City cannot revoke its permit because the City approved its revised plans; and that once the City approved the remodel as being under the 30 percent threshold based on HBL's original cost estimate, the City could not revoke the permit simply because the actual cost was higher than the estimate. We disagree and conclude that HBL exceeded the scope of its permit.

¶33 First, HBL's "vested right" argument is nothing more than a red herring. Although HBL argues that it has a "vested right" to build the building depicted in the plans submitted with its approved permit, it is well settled that the issuance of a permit does not grant the applicant a right "to erect a structure of the type and at the place approved."[18] The vested rights doctrine merely gives permit applicants a vested right to have their application processed according to the zoning and building ordinances in effect at the time of the application.[19] "The purpose of the 'vested rights doctrine' is to determine or 'fix' the rules that will govern land development with reasonable certainty."[20] Here, there is no dispute as to which version of the BCC applies to HBL's project.

¶34 Second, the City's approval of revised plans does not prevent the City from revoking a permit for a project that does not comply with applicable codes. The City's jobsite approvals are stamped with the express notation, "OVERSIGHT OR VIOLATIONS OF CITY ORDINANCES ARE

---

[18] *Taylor v. Stevens County*, 111 Wn.2d 159, 167, 759 P.2d 447 (1988).

[19] *Rhod-A-Zalea & 35th, Inc. v. Snohomish County*, 136 Wn.2d 1, 16, 959 P.2d 1024 (1998).

[20] *Rhod-A-Zalea*, 136 Wn.2d at 16.

NOT INCLUDED IN THIS APPROVAL." Moreover, our Supreme Court has held that the duty to comply with building and land use codes lies with individual permit applicants, builders, and developers rather than local governments.[21]

¶35 In *Taylor v. Stevens County*,[22] purchasers of a residential property alleged that Stevens County had negligently issued a building permit to the previous owners. The previous owners had built the home without obtaining a building permit. However, before the plaintiffs purchased the property, the county inspected the building and issued a building permit.[23] After the purchase, the plaintiffs discovered that the building did not comply with the building code.[24] The court held that a municipality has no duty to determine compliance with building codes when issuing a building permit or conducting an inspection.[25]

> Issuance of a building permit does not implicitly imply that the plans submitted are in compliance with all applicable codes. Nor do periodic building code inspections implicitly imply that the construction is in compliance with all applicable codes. Building permits and building code inspections only authorize construction to proceed; they do not guarantee that all provisions of all applicable codes have been complied with.[26]

¶36 Thus, while the City's approval of the revised plans authorized construction to proceed, it was always HBL's duty to ensure that its project met all code requirements, including the requirement that the project either remain below the 30 percent threshold or be subject to proportional compliance.

---

[21] *Taylor*, 111 Wn.2d at 168.

[22] 111 Wn.2d 159, 759 P.2d 447 (1988).

[23] *Taylor*, 111 Wn.2d at 161.

[24] *Taylor*, 111 Wn.2d at 161-62.

[25] *Taylor*, 111 Wn.2d at 168.

[26] *Taylor*, 111 Wn.2d at 167.

¶37 Finally, we reject HBL's argument that the City could not revoke its permit because unforeseen circumstances increased the cost of its remodel project. HBL argues that the BCC does not permit the City to reevaluate the cost of a remodel after a project has started. If that were allowed, HBL argues, a builder faced with a midproject increase in lumber or labor prices could lose its permit due to circumstances outside its control.

¶38 The circumstances here, however, were neither unforeseeable nor outside of HBL's control. The condition of the existing structure's foundation could have been discovered by HBL during the permitting process. The City specifically questioned HBL about the integrity of the foundation and requested an engineer's statement that the foundation could support the planned remodel. Without obtaining an engineer's statement, HBL assured the City that the foundation was sound. HBL submitted plans indicating that the existing foundation and some exterior walls would be retained. Based on these plans, the City issued a building permit for HBL to construct a remodel valued at 29.84 percent of replacement value. The additional foundation work and exterior walls were not included in the City's calculation determining that the project was below the 30 percent threshold. Thus, this work was outside the scope of work authorized by HBL's building permit.

¶39 The City's determination that HBL had exceeded the scope of its permit is supported by substantial evidence when viewed in light of the whole record.[27] HBL has not met its burden of establishing that the City's decision was erroneous under any of the standards in RCW 36.70C.130.

### 2. *Nonconforming structure or site*

¶40 In its March 2, 2007, letter, the City stated that, because work had been done outside the scope of the permit, HBL's project could "no longer be considered the remodel of an existing structure within the meaning of

---

[27] *See* RCW 36.70C.130(1).

Land Use Code Section 20.20.560, and therefore is not entitled to any status as a non-conforming building or site." The letter effectively revoked HBL's building permit because it required HBL to submit a new design review application and show that the project would meet the setback requirements for nonconforming lots, and either meet all other dimensional requirements for the office zoning district or apply for a variance. Because of the small size of the lot, following setback requirements would leave HBL only 32 square feet on which to build.

¶41 The superior court concluded that the City made an erroneous application of the law to the facts when it concluded that the project could no longer be considered a remodel of an existing structure under BCC 20.20.560. This was based on the court's incorrect conclusion that because the City approved HBL's changes, none of the work could be considered outside the scope of the permit.

¶42 Here, in order to show that its project still qualified as a nonconforming use that did not require further site compliance under BCC 20.20.560(C), HBL needed to show that the remodel under the revised plans was below the 30 percent threshold. Although HBL implies that it also has made revisions that have diminished the cost of the remodel, possibly offsetting the cost of the foundation repairs and additional walls, HBL presented no evidence to the City to show that the net result remained a remodel below the 30 percent threshold. Therefore, HBL has not met its burden of establishing that it is entitled to relief under LUPA.

### 3. *Effect of moratorium*

■ ¶43 HBL argues that the City erred in concluding that the moratorium prevented it from accepting or processing the permits necessary for HBL to recommence construction because the vested rights doctrine precludes the City from applying to its project ordinances enacted after HBL submitted its permit application. However, because HBL has not shown that the City has refused to process any

permits for which HBL has applied, this issue is not ripe for review.

## C. *Attorney Fees*

¶44 We deny HBL's request for attorney fees. A party is entitled to attorney fees after judicial review of an administrative decision only if a county, city, or town renders a decision in its favor and at least two courts affirm that decision.[28] Because the City did not render a decision in HBL's favor, there is no possibility that HBL would be entitled to attorney fees in this LUPA appeal, even if this court were to decide in its favor.

## Conclusion

¶45 We hold that the stop work order was not a final decision but the March 2, 2007, letter was a final land use decision. HBL timely appealed the City's land use decision by filing a LUPA petition on March 23, 2007. Because HBL has not shown that the City's land use decision met one of the standards entitling it to relief under RCW 36.70C.130, we reverse the superior court's decision and dismiss the LUPA petition.

¶46 Reversed and dismissed.

GROSSE and Cox, JJ., concur.

---

[28] RCW 4.84.370; *Habitat Watch*, 155 Wn.2d at 413.