IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JAMES and EVELYN CHUMBLEY, husband and wife; BNSF RAILWAY COMPANY, INC., a Delaware corporation, | ) ) ) ) ) | No. 74528-0-I<br><br>DIVISION ONE |
| Appellants, | ) ) | |
| and | ) ) | |
| IRENE ARTHERHOLT; THE LESTER G. AND IRENE ARTHERHOLT REVOCABLE TRUST; GLENN AND PATRICIA DALBY, husband and wife; ROY MAIN; THOMAS and MADELINE NORMAN, husband and wife; | ) ) ) ) ) ) ) | PUBLISHED OPINION |
| Plaintiffs, | ) ) | FILED: December 27, 2016 |
| v. | ) ) | |
| SNOHOMISH COUNTY, a Washington municipal corporation; SNOHOMISH HEALTH DISTRICT, a Washington municipal corporation; BEGIS BUILDING INC., a Washington corporation; JAKE BEGIS, | ) ) ) ) ) ) ) | |
| Respondents, | ) ) | |
| and | ) ) | |
| KEE BONG KIM and DIANA YONG, husband and wife, | ) ) ) | |
| Defendants. | ) ) ) | |

BECKER, J. — Steep bluffs rise above the railroad tracks that run along the shoreline between Edmonds and Mukilteo. A developer built a residence on an upland lot and began to install an approved sewage disposal system on two hillside lots below. While grading the hillside for the drain field, the installer struck a spring and caused seepage to flow down the slope and into a private driveway. The railroad and neighboring homeowners sued to stop the use of the sewage disposal system pending further engineering analysis. They alleged that grading had occurred on the hillside lots without enforcement of Snohomish County ordinances regulating the disturbance of land in landslide hazard areas. The trial court dismissed the action as an untimely land use petition that should have been brought months earlier when the sewage system was approved and the building permit was issued.

The dismissal was a misapplication of Samuel's Furniture, Inc. v. Dep't of Ecology, 147 Wn.2d 440, 54 P.3d 1194, 63 P.3d 764 (2002). The county has an independent and ongoing responsibility to regulate grading on steep slopes. That responsibility is not discharged or preempted when a health district approves a sewage system for placement on a slope. Because this action was timely filed within 21 days of the county's final decision that a permit to grade the hillside lots was not required, we reverse and remand for reinstatement of the complaint.

2

CHRONOLOGY

In 2014, respondents Jake Begis and his company, Begis Building Inc. ("Begis"), made plans to build a single-family residence at 11706 Marine View Drive, Edmonds, Washington. The Marine View Drive address for the residence Begis planned is on an upland lot numbered 36.

To begin the project, Begis had to get permission from two distinct governmental entities. He needed to get a building permit from the Snohomish County Department of Planning and Development Services ("County Planning"). County Planning administers the Snohomish County Unified Development Code, Title 30 of the Snohomish County Code (SCC). When application is made for construction on a parcel of land not served by a public sanitary sewer system, County Planning may not issue a building permit "without prior approval from the Snohomish Health District of an approved means of waste disposal." SCC 30.50.104(2). Because lot 36 is not served by a public sewer, Begis also needed an approval from the Snohomish Health District, an independent special purpose district. The Health District regulates location, design, operation, maintenance, and monitoring of onsite sewage systems in the county under rules adopted by the State Board of Health. RCW 43.20.050(3); WAC 246-272A-0001(2); see Snohomish Health District Sanitary Code chs. 8.1, 8.5, 8.6.

On August 11, 2014, Begis applied to the Health District for an onsite sewage disposal permit. Clerk's Papers at 236. Begis applied for a permit for what is referred to as an "onsite" system even though the drain field was, in a

3

sense, offsite; that is, it was not going to be on lot 36 with the residence.[1] As would later become clear in the course of the Health District's review, see Clerk's Papers at 411-13, 426, 453, the application proposed to pipe the septic effluent down the street, across an easement over a neighbor's property, and downhill to two vacant lots Begis owns on the bluff facing west. These hillside lots are numbered 60 and 61. They are located above the north-south line of tracks for respondent Burlington Northern Santa Fe Railroad and homes on the west side of Possession Lane.

On December 2, 2014, Begis applied to County Planning for a building permit to build the residence on lot 36. Clerk's Papers at 691. The building permit application did not mention lots 60 and 61. And it did not mention the plan for building a septic drain field on the hillside below the residence.

On the same date, Begis applied to County Planning for a land disturbing activity permit for the construction of the residence on lot 36. Clerk's Papers at 222. The reason for this application was that County Planning, in addition to being in charge of issuing building permits under SCC 30.50.104, has additional responsibilities under two other chapters: Land Disturbing Activity, chapter 30.63B SCC, and Geologically Hazardous Areas, chapter 30.62B SCC. These are among the ordinances the county enacted to fulfill the mandate of the Growth Management Act, chapter 36.70A RCW, for the adoption of development regulations to protect critical areas, which include geologically hazardous areas.

---

[1] An onsite sewage system means "an integrated system of components, located on *or nearby* the property it serves, that conveys, stores, treats, and/or provides subsurface soil treatment and dispersal of sewage." WAC 246-272A-0010(2) (emphasis added).

RCW 36.70A.060(2); RCW 36.70A.030(5); SCC 30.10.080. Before the commencement of any nonexempt land disturbing activity as defined in SCC 30.91L.025, a land disturbing activity permit must be obtained from County Planning. SCC 30.63B.030. A land disturbing activity permit will not be issued unless there has been review under the State Environmental Policy Act, chapter 43.21C RCW, if applicable. SCC 30.63B.050(1)(g). In geologically hazardous areas, including landslide hazard areas, development activity may not occur without permission from County Planning, conditioned on submission of a site development plan, a geotechnical report, and approval of a critical area site plan. SCC 30.62B.130, .140, .160.

The application for a land disturbing activity permit had a number linking it to the building permit application for lot 36. The application described the project as a single family residence on lot 36 with an "off site septic system." It did not mention lots 60 and 61 as the proposed location for the septic system. Clerk's Papers at 222. Begis did not separately apply for a land disturbing activity permit for lots 60 and 61, even though he planned to use them as the site of the drain field for the sewage system.

Lot 36 was designated as a critical area because of its proximity to steep slopes. Clerk's Papers at 230. See SCC 30.91C.340(5)(b). County Planning reviewed the drainage plan and storm water site plan and required submission of a critical area site plan. See generally SCC 30.62B.030-.160. Comments by County Planning were concerned solely with lot 36. Clerk's Papers at 230. Presumably, the same review would have been conducted for lots 60 and 61 if

an application had been submitted for those lots. With slopes greater than 33 percent, lots 60 and 61 are also in an area designated as a critical area because of the history and risk of landslide hazard. Clerk's Papers at 293, 296, 453.

On December 15, 2014, the Health District disapproved the application for an onsite sewage disposal permit, noting that the area along Possession Lane had been subject to previous landslides. The Health District required Begis to submit an engineering report with "technical reasoning explaining how stability of the land in the proposed primary and reserve sewage disposal areas" would meet the requirements of State Board of Health regulations for location of onsite sewage systems, WAC 246-272A-0210. Clerk's Papers at 242.

On January 7, 2015, Begis submitted a geotechnical report from engineer Peter Chopelas in response to the Health District's concerns. The summary of the report stated that the stability of the building site would not be affected by the addition of a septic system on the bluff. Clerk's Papers at 451.

On January 29, 2015, the Health District again disapproved the application, requesting a geotechnical report specific to lots 60 and 61. Clerk's Papers at 453.

On February 3, 2015, Chopelas submitted a more detailed engineering report. Clerk's Papers at 455-56.

On February 23, 2015, the Health District approved the application for an onsite sewage disposal permit. Clerk's Papers at 682-88. Under SCC 30.50.104(2), the Health District's approval cleared the way for County Planning to issue a building permit for the residence on lot 36.

On February 24, 2015, County Planning issued a building permit for the residence on lot 36 and a land disturbing activity permit for lot 36 for "Clearing, grading and Targeted Drainage Plan" for the proposed single family residence. Clerk's Papers at 690, 233. Neither of these permits mentioned lots 60 and 61.

On March 17, 2015, Randolph Sleight, chief engineering officer for County Planning, sent Begis a stop work order noting "ongoing issues" relating to the clearing and grading of lot 36 beyond the limits of the land disturbing activity permit. The letter required Begis to stabilize the site and stop work pending drier weather and closer inspection. "If the applicant does not comply, the County will initiate revocation of your permits per SCC 30.85.310." Clerk's Papers at 245-46. At the request of County Planning, a peer review of Chopelas' geotechnical report was conducted, but only with respect to lot 36. Clerk's Papers at 170.

On April 23, 2015, County Planning lifted the stop work order. Clerk's Papers at 248.

On June 11, 2015, the Health District gave Begis an installation permit for the previously approved sewage disposal system. Clerk's Papers at 463. To proceed with the installation, Begis hired a contractor to grade lots 60 and 61 for use as the drain field.

On June 29, 2015, William Hultman of the consulting firm of Shannon & Wilson Inc. wrote to County Planning and the Health District with concerns about the construction of the drain field on lots 60 and 61. Shannon & Wilson had been hired by the railroad to do a geotechnical review and to critique the engineering reports submitted by Chopelas. Hultman asserted that the Chopelas reports

mischaracterized the geology of the site, failed to account for the presence of groundwater, recommended an alignment for piping the effluent downhill that risked introducing additional water into a known landslide hazard area, and used unsound engineering methods. Hultman stated the firm's opinion that the proposed construction of the drain field on the hillside above the tracks would possibly expose the railroad and the travelling public to added slope stability hazards "during construction and over the service life of the installation." Clerk's Papers at 164-71.

On July 6, 2015, attorneys for the railroad wrote to County Planning and the Health District to inform them that within the past week, groundwater had been seen flowing down the slope from where the contractor was drilling the path for the pipeline to the drain field. The letter enclosed a field report by Shannon & Wilson documenting the groundwater seepage. The report stated, "It is likely that the drillhole intercepted a groundwater-bearing layer in the slope." Clerk's Papers at 177-78.[2]

On July 14, 2015, County Planning posted a stop work order on lots 60 and 61 "for altering drainage." The complaint investigation report notes, "Seepage coming from site and a ditch was dug across road and onto BNSF property." Clerk's Papers at 220.

On July 20, 2015, County Planning issued a notice of violation directed to Begis. The notice stated that land disturbing activity on lots 60 and 61 had

---

[2] The grading contractor later admitted to County Planning that he struck an underground spring and dug a ditch to divert the flow onto a private road. Clerk's Papers at 262.

occurred without a permit. See SCC 30.63B.030. "The land disturbing activity involved the alteration of a natural drainage course and grading within a critical area." The suggested corrective actions included obtaining a land disturbing activity permit. Clerk's Papers at 251.

On July 22, 2015, Sleight informed Begis that the diversion of the flow into the ditch was unacceptable. A land disturbing activity permit for the work being done on lots 60 and 61 was necessary, and it would have to be supported by an alternative drainage plan. Sleight's letter stated, "No additional work is allowed or authorized on this site until a land disturbing activity permit has been approved by the County." Clerk's Papers at 254-55.

Also on July 22, 2015, an attorney for the county sent a letter to appellants acknowledging receipt of the June 29 and July 6 correspondence. The letter advised that concerns regarding the approved sewage system should be specifically directed to the Health District because it was the issuing agency. The letter stated, "On July 14, 2015, the County issued a stop work order for additional work in the area separate and distinct from the OSS [onsite sewage system] concerning Land Disturbing Activity without the necessary permits and approvals. The County is following its standard procedures to address that matter." Clerk's Papers at 189.

On August 5, 2015, Begis applied for a land disturbing activity permit for lots 60 and 61. The application was separate from the earlier application pertaining to lot 36. The project was to "add a drainage culvert for run-off control

on Possession Lane to catch seepage and convey it to existing catch basin." Clerk's Papers at 265-66.

On August 12, 2015, appellants wrote to the county and the Health District, noting the absence of any documented review of lots 60 and 61 for land disturbing activity and development in critical areas. They asserted that County Planning—not the Health District—was responsible for conducting that review. Their letter claimed that despite the stop work order posted on July 14, Begis was still clearing brush and drilling perk test holes on the hillside lots as recently as August 11 and there was a continuing discharge of turbid water and sediment water from the previously drilled hole. Clerk's Papers at 159.

On the same date, Sleight wrote to Begis that the grading and seepage on lots 60 and 61 was a violation that had to be resolved by restoration before a certificate of occupancy could be issued for the residence, and he reiterated that a land disturbing activity permit was required. Sleight informed Begis that the Shannon & Wilson report had raised "concerns regarding the location of the proposed drainfield on Lots 60 and 61." His letter stated that the county did not issue or approve permits for this work and deferred to the Health District for review and next steps in addressing the concerns raised by Shannon & Wilson. Clerk's Papers at 274.

On August 18, 2015, Chopelas reported to County Planning that adding a culvert would solve the problem of surface drainage and "no drainage modification approval should be necessary." Clerk's Papers at 277.

On September 4, 2015, County Planning wrote to Begis stating that approval of the drainage modification could not be recommended due to insufficient information. Clerk's Papers at 283.

On September 8, 2015, Begis responded to County Planning by e-mail concerning his application for a land disturbing activity permit for work on lots 60 and 61. His message stated, "The seepage is permanently stopped. So, we will not be needing this permit, and, I am withdrawing the application." Clerk's Papers at 283.

On September 9, County Planning made the following entry into its case activity log:

- Begis is taking out the pipe and filling in the ditch with dirt
- No permit will be required
- No water is discharging through the area
- The leak has been located and corrected

Clerk's Papers at 260.

That same day, County Planning closed its case file on the enforcement action.[3]

On September 17, 2015, the Health District asked County Planning to confirm that the stop work order and notice of violation had been remedied. A County Planning manager responded that the grading code violation and stop work order "are being addressed and are not viewed as related to the final inspection of the building permit." The Health District pressed for assurance that

---

[3] The date of case closure is listed as September 9, 2015, in a summary of the enforcement action initiated by the stop work order on July 14, 2015. Clerk's Papers at 291. The case activity log lists the date of case closure as September 11, 2015. Clerk's Papers at 260. For purposes of this appeal, we assume the closure occurred on September 9.

the notice of violation had been resolved because the outcome might affect the Health District's final review of the sewage system as built. The County Planning manager replied, "It doesn't matter, the drainfield is a separate issue. However, it's my understanding that the stop work has been resolved through restoration." Clerk's Papers at 286-87 (e-mail correspondence). The Health District inspected the site and gave final approval of the installation of the sewage disposal system on September 18, 2015. Clerk's Papers at 400, 402, 463.

On September 22, 2015, County Planning made a final inspection of the work done under the building permit for lot 36. The final inspection approval constituted a certificate of occupancy for the residential structure. Clerk's Papers at 469-70.

On September 25, 2015, Begis sold the completed home to respondents Kee Bong Kim and Diana Yong. Clerk's Papers at 389.

On September 30, 2015, the present action was filed against the county, the Health District, Begis, and new homeowners Kim and Yong. The plaintiffs are the railroad and neighboring homeowners. Some own property on Possession Lane below lots 60 and 61, and some own property on Marine View Drive that rely on lots 60 and 61 for lateral and subjacent support. Among other things, their amended complaint alleges that County Planning failed to assure that the construction of the sewage system drain field on lots 60 and 61 complied with the county's land disturbing activity code and critical areas ordinances. According to the complaint, the county improperly deferred enforcement to the Health District.

The complaint seeks various forms of relief, including review under the Land Use Petition Act (LUPA), chapter 36.70C RCW. The complaint asks the court to enjoin the homeowners from using the sewage system and to prohibit County Planning and the Health District from issuing further approvals in the absence of proper review.

On October 7, 2015, the plaintiffs moved for an order to show cause why writs of review, mandamus, and prohibition should not be issued.

On October 28, 2015, the county filed an answer admitting that it did not perform any "permitting review" relating to the location of the sewage system on lots 60 and 61. The county's answer asserted that it did not have to perform such review because the Health District had exclusive authority to approve applications for the design and installation of onsite sewage systems. Clerk's Papers at 663-65. The Health District filed an answer stating that the county had the exclusive responsibility for reviews required by the critical areas ordinances. Clerk's Papers at 638.

In November 2015, the defendants moved to dismiss the complaint as an untimely land use petition. The parties filed briefs.

On December 2, 2015, after a hearing, the court entered a written order granting the motion to dismiss. The court concluded that LUPA provided an adequate remedy at law for all stated causes of action and the complaint was untimely because it was filed months after the 21-day deadline expired for challenging the building permit under LUPA.

This appeal followed. Denial of a motion to dismiss a LUPA action is reviewed de novo. Durland v. San Juan County, 175 Wn. App. 316, 320, 305 P.3d 246 (2013), aff'd, 182 Wn.2d 55, 340 P.3d 191 (2014).

## DISCUSSION

A land use petition is timely if it is filed within 21 days "of the issuance of the land use decision." RCW 36.70C.040(3)(2). This deadline is "stringent." Asche v. Bloomquist, 132 Wn. App. 784, 795, 133 P.3d 475 (2006), review denied, 159 Wn.2d 1005 (2007). It reflects a strong public policy of finality in land use decisions. Samuel's Furniture, 147 Wn.2d at 458-59. Even illegal land use decisions will be allowed to stand if not timely challenged under LUPA. Habitat Watch v. Skagit County, 155 Wn.2d 397, 407, 120 P.3d 56 (2005).

"Land use decision" means a final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination on three different types of decisions. RCW 36.70C.020(2).[4] A land use decision

---

[4] (2) "Land use decision" means a final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals, on:

(a) An application for a project permit or other governmental approval required by law before real property may be improved, developed, modified, sold, transferred, or used, but excluding applications for permits or approvals to use, vacate, or transfer streets, parks, and similar types of public property; excluding applications for legislative approvals such as area-wide rezones and annexations; and excluding applications for business licenses;

(b) An interpretative or declaratory decision regarding the application to a specific property of zoning or other ordinances or rules regulating the improvement, development, modification, maintenance, or use of real property; and

(c) The enforcement by a local jurisdiction of ordinances regulating the improvement, development, modification,

should memorialize the terms of the decision, not simply refer to them, in "some tangible, accessible way" so that a diligent citizen may "know whether the decision is objectionable or, if it is, whether there is a viable basis for a challenge." Vogel v. City of Richland, 161 Wn. App. 770, 780, 255 P.3d 805 (2011); see also Durland v. San Juan County, 174 Wn. App. 1, 13, 298 P.3d 757 (2012).

The building permit did not memorialize in a tangible, accessible way any terms controlling development on lots 60 and 61. A diligent citizen who examined the building permit and the land disturbing activity permit issued on February 24, 2015, would have learned only about the construction proposed for lot 36.

Respondents nevertheless contend the complaint is a belated challenge to the issuance of the building permit. The building permit was issued for lot 36 on February 24, 2015, after the Health District approved the design and location of the onsite sewage system. Respondents contend the issuance of the building permit was a "determination by inference" that Begis could build the residence without further reviews and permits. They argue that if the railroad and homeowners believed review under the code provisions for land disturbing activity and critical areas was legally required, they had to bring a LUPA petition within 21 days of the building permit issuance. They say under Samuel's Furniture, another case involving government entities with overlapping regulatory

maintenance, or use of real property. However, when a local jurisdiction is required by law to enforce the ordinances in a court of limited jurisdiction, a petition may not be brought under this chapter.

responsibilities, the building permit implied that Begis had been cleared to grade lots 60 and 61.

In Samuel's Furniture, the city of Ferndale determined that a furniture business did not require a shoreline permit to expand for expansion of its store because the project was *outside* the designated shoreline area. Samuel's Furniture, 147 Wn.2d at 444. Ferndale issued a building permit and a fill and grade permit. Samuel's Furniture, 147 Wn.2d at 445. A year later, when the project was already under construction, the Department of Ecology used a different map and concluded the project was *inside* the designated shoreline area. The Department of Ecology threatened enforcement action unless the business obtained a permit for substantial development on a shoreline. Samuel's Furniture, 147 Wn.2d at 445. The Supreme Court held that the Department of Ecology, having failed to challenge Ferndale's permitting decision by means of a timely LUPA petition, was barred from collaterally attacking the decision by means of an independent enforcement action. Samuel's Furniture, 147 Wn.2d at 463.

> The City's issuance of the fill and grade and building permits necessarily required a determination that the project was outside the shoreline jurisdiction. . . . Ecology could have challenged the issuance of those permits on the basis that they are inconsistent with the SMA [Shoreline Management Act of 1974] because no substantial development permit was issued.

Samuel's Furniture, 147 Wn.2d at 451; see also Twin Bridge Marine Park, LLC v. Dep't of Ecology, 162 Wn.2d 825, 829, 175 P.3d 1050 (2008).

County Planning could not have issued the building permit without the Health District's prior approval of the sewage system. The respondents thus

16

argue that the building permit necessarily required a preliminary determination that the plan to grade lots 60 and 61 had been fully reviewed for compliance with regulations having any relationship to the sewage system, in the same way that the Ferndale permits in Samuel's Furniture necessarily required Ferndale to make a preliminary determination that the project was not on the shoreline. They contend the appellants' request for revocation of the building permit pending further environmental review is an untimely collateral attack on the building permit.

The analogy to Samuel's Furniture is unsound. The issuance of a building permit did not necessarily require County Planning to make a preliminary decision approving grading for the drain field on lots 60 and 61. No ordinance or statute requires such preliminary approval. Begis did not file an application for a land disturbing activity permit to grade lots 60 and 61 or otherwise seek approval from County Planning before beginning the grading.

The Health District's approval of the onsite sewage system is not a substitute for County Planning's ongoing duty to enforce the critical areas ordinances when a sewage system is installed in a landslide hazard area. Unlike in Samuel's Furniture, the two regulatory agencies—County Planning and the Health District—did not have the same decision to make and did not have regulatory authority over the same activities. They operate under different governing statutes with different purposes. As the Health District describes its mission, the focus "is directed to effective treatment of sewage effluent from a public health perspective." The Health District's review of the design and location

17

of an onsite sewage system is concerned to some degree with the potential for erosion, WAC 246-272A-0220. But the Health District is not charged with deciding whether grading a hillside for a drain field is permitted under the Snohomish County Code. The Health District does not enforce the county code provisions designed to prevent landslides.

The record reflects the two agencies' understanding that they have different responsibilities. The county's letter of July 22, 2015, characterized the stop work order as related to "additional work in the area separate and distinct" from the onsite sewage system. The county's final correspondence with the Health District took pains to characterize the stop work order and notice of violation as unrelated to the Health District's approval of the sewage system. The Health District's answer to the complaint states that the responsibility for enforcing the county code in critical areas is exclusively the county's.

The county argues in part that regulations for onsite sewage systems preempt the county from enforcing its own ordinances. The Health District disagrees with the county on this point, Clerk's Papers at 645, and rightly so. The statute authorizing the Board of Health regulations, RCW 43.20.050, is concerned with the appropriate design and construction of onsite sewage systems. It contains no preemptive language negating a county's ability to concurrently enforce ordinances protecting slope stability.

The building permit stated on its face that "all activity authorized by this permit shall comply with chapters 30.63A and 30.63B SCC," the county code provisions governing drainage and land disturbing activity. Clerk's Papers at

18

690. This language speaks to future activity, after the building permit is issued. Thus, County Planning's issuance of the building permit for lot 36 did *not* imply a final decision not to review grading activity on lots 60 and 61 under the county critical areas ordinances. Begis was not entitled to assume that the building permit cleared him to grade lots 60 and 61 without a land disturbing activity permit.

County Planning's issuance of the building permit for lot 36 also did *not* imply the completion of the enforcement actions the county would later undertake. In March 2015, County Planning issued a stop work order when Begis exceeded the limits of the land disturbing activity permit for clearing on lot 36 and threatened to revoke the building permit. In July 2015, County Planning posted a stop work order in response to the seepage coming from lots 60 and 61. In August 2015, County Planning threatened to withhold the occupancy permit unless Begis obtained a land disturbing activity permit for the grading on these lots. The building permit issued on February 24, 2015, could not have been a final land use decision as to these later enforcement actions.

When the seepage was observed in July 2015, County Planning readily recognized its independent responsibility to protect the hillside. Sleight directed Begis to apply to County Planning—not to the Health District—for a land disturbing activity permit for the restoration work being done on lots 60 and 61.[5]

---

[5] On August 6, 2015, Sleight documented a phone call from the grading contractor:
> He acknowledged that he had done the temporary diversion of drainage that was coming from his drilling excavation work . . . .
>     . . . .

19

Sleight recognized that the installation of the sewage system, though permitted by the Health District, also needed a permit from County Planning because it was being done in a critical area and it threatened the stability of the hillside. It is unclear why County Planning decided in September 2015 that a permit was not required.

We reject the respondents' argument that the complaint is an implied challenge to or a belated collateral attack on the building permit. The building permit was for lot 36. It did not memorialize or imply a decision that permits and review under the land disturbing activity and critical areas ordinances was unnecessary for work done on lots 60 and 61. Insofar as the building permit had any relationship to lots 60 and 61, the most it may have implied is that the design and location of the onsite sewage system satisfied State Board of Health rules that are primarily concerned with the effective treatment of effluent.

---

. . . clearly he must have tapped a shallow perched aquifer or water table at the top of the bluff and redirected it down over the bank via his drilling operation. . . .

I asked him how he would feel if someone piped water directly onto his property and he agreed that this was not right. . . .

I asked why he diverted the flows onto the neighbor and he said that was a better place than going down the driveway. . . .

I then told him that this violation is a potentially very serious problem which he may have made worse and that being the overall stability of the hillside and that he and Mr. Begis were responsible to correct the violations that had occurred. . . .

He closed the conversation by indicating he would be trying to find and stop the migration of water at its source and thus relieve the flow going into the temporary pipe and restore the ground and remove the pipe. I told him even this work would require a permit . . . since all the work that he was describing was in a critical area.

Clerk's Papers at 262.

A building permit is one type of land use decision. RCW 36.70C.020(2)(a). It is not the only type. A land use decision may also be a final determination on "the enforcement by a local jurisdiction of ordinances regulating the improvement, development, modification, maintenance, or use of real property." RCW 36.70C.020(2)(c). A final determination is one which leaves nothing open to further dispute and which sets at rest the cause of action between parties. Samuel's Furniture, 147 Wn.2d at 452.

The complaint seeks review of the county's decision that Begis did not have to obtain a permit to grade lots 60 and 61. This was a "land use decision" concerning enforcement. RCW 36.70C.020(2)(c). It did not become final with the issuance of the building permit because the potential for enforcement of the county code on lots 60 and 61 continued to exist after the issuance of the building permit.

County Planning closed its enforcement file on September 9, 2015, with the decision that "no permit will be required." County Planning certified the building for occupancy on September 22, 2015. These were County Planning's final determinations that the county was finished with enforcement of land disturbing activity and critical area ordinances on lots 60 and 61. Until these decisions were made, it was open to further dispute whether County Planning would require Begis to apply for a permit and submit to a rigorous geotechnical review such as County Planning conducted for lot 36.

Because the present action was filed on September 30, 2015, it was within the 21-day deadline. It was timely and should not have been dismissed.

Whether the county code requires further review and permitting for lots 60 and 61 is an issue yet to be resolved on the merits. Our only holding is that the complaint should not have been dismissed as untimely. On remand, all causes of action in the complaint will be subject to resolution by the trial court.

Begis contends that even if the order of dismissal is reversed as to the other respondents, it should be affirmed as to him and his company because they retained no interest in the property and the complaint seeks no relief from them. We reject this argument. Applicants as well as owners are necessary parties to an action under LUPA. RCW 36.70C.040(2).

The order of dismissal is reversed and remanded for reinstatement of the complaint and further proceedings not inconsistent with this opinion.

Becker, J.

WE CONCUR: